418 F.2d 1191
 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Liberty Coach Company, Inc., Intervenor.
LIBERTY COACH COMPANY, Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Union of Electrical, Radio and Machine Workers, AFL-CIO, Intervenor.
 No. 22181.
 No. 22394.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 9, 1969.
 Decided July 22, 1969.
 
 Mr. Melvin Warshaw, New York City, with whom Mr. Irving Abramson, New York City, and Miss Ruth Weyand, Washington, D. C., were on the brief, for petitioner in No. 22,181 and intervenor in No. 22,394.
 Mr. Julian H. Singman, Washington, D. C., with whom Mr. Stephen M. Nassau, Washington, D. C., was on the brief, for petitioner in No. 22,394 and intervenor in No. 22,181.
 Mr. Elliott Moore, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for respondent.
 Before WRIGHT, McGOWAN and TAMM, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 This case falls within a factual pattern common to disputes arising out of union organizing campaigns. The International Union of Electrical, Radio and Machine Workers tried to organize the Syracuse, Indiana, establishment of the Liberty Coach Company, a manufacturer of mobile homes. The union and the company then entered into a stipulation for a consent election, approved by the Regional Director of the National Labor Relations Board, which defined the bargaining unit.[1]
 
 
 2
 After all challenges and objections had been made, the Board found that the union had won the election by one vote and certified it as exclusive bargaining representative of the employees in the unit. The company refused to bargain in order to gain judicial review of the representation proceeding, which it claims was tainted by the Board's failure to hold a factual hearing, by erroneous inclusion of two employees in the stipulated unit, and by improper counting of a ballot which should have been disqualified. The Board rested on the correctness of its representation proceeding in finding the company guilty of violation of Section 8(a) (5) of the National Labor Relations Act.[2]
 
 
 3
 After the certification, the company discharged an employee who had supported the union. Against the company's claim that the discharge was for good cause, the Board found that it had been in retaliation for the employee's union activities, thus violating Section 8(a) (3) of the Act.[3] The Board further found that three instances of questioning of employees by supervisors concerning union activities amounted to coercive interrogation, illegal under Section 8(a) (1) of the Act.[4]
 
 
 4
 In our view, the Board's findings that the company violated Sections 8(a) (1) and 8(a) (3) by the discharge and the interrogation of employees are supported by substantial evidence and must be affirmed. However, we find that further proceedings are necessary to determine whether the union was properly certified on the basis of the election.
 
 
 5
 * We find it convenient to consider the discharge and interrogation questions first, although the facts involved postdate the election and certification. On August 30, 1967, shortly after the Board certificate had been issued to the union, a fire at the company's plant forced a shutdown. The president of the company, Mr. Hussey, told the employees that, while he hoped to reopen that Friday, a more realistic target was the next Tuesday, the day after Labor Day. The plant did in fact reopen on that day. Employee Willis Newby neither reported for work nor informed the company of the reason for his absence. When President Hussey was told of Newby's unexplained absence at 10:30 that morning, he ordered him discharged for "lack of interest" in the company. When Newby called in at 2:00 o'clock in the afternoon to ask if the plant was open, he was told that it was and that he had been discharged.
 
 
 6
 Newby had been an active adherent of the union, one of only five employees who served on both the organizing and the administrative committees. He had worked at the company for some 18 months before his discharge, and before the day in question had not a single unexplained absence on his record. At the hearing the trial examiner found that the company's act in firing him for a single unexplained absence was unique in its harshness. Other employees had received only written warnings, even after several such absences.
 
 
 7
 However, the company argued that it had placed special importance upon attendance on the day in question, because the plant was reopening after a damaging fire during the busy season. The company further argued that one Amos Yoder, not a union member, had been fired for his unexplained absence on the same day. The trial examiner accepted the company's explanation of the unprecedentedly harsh punishment. The Board, without reversing any of the examiner's findings of primary fact, drew the contrary inference.
 
 
 8
 The Board noted that Newby was an experienced worker with a previously unblemished record, and hence that the company's claim that it had fired him because of its urgent need for a full work force rang hollow. It concluded on the basis of the examiner's findings that Yoder had in fact quit work the previous week and that the company was aware of this. Yoder had indirectly informed his supervisors that he was leaving, and his time card was not in the rack on Tuesday morning, although Newby's was. The Board finally placed chief reliance on the company's unbroken pattern, both before and after Newby's discharge, of relatively lenient response to single instances of unexplained absence.
 
 
 9
 In our view, the facts as found by the trial examiner and adopted by the Board provide substantial evidence to support the conclusion that Newby was discharged in retaliation for his union activities.[5] This is not to say that the contrary conclusion drawn by the trial examiner was itself unreasonable. Often a set of facts will supply substantial evidence for either of two conflicting conclusions. In such instances, Congress has decided that the Board's inference shall control.[6]
 
 II
 
 10
 About a week after Newby's discharge, Weaver, a vice president of the company, talked to an employee, Giengerich, in Weaver's office. Weaver asked Giengerich about the "guys that were in [the union]," and Giengerich mentioned certain employees by name as being on the union committee. The trial examiner found the question non-coercive because the union had previously furnished the company with the names of employees active on behalf of the union, and because the employees had openly and freely engaged in union activity at the plant. The Board, on the same facts, found "an unlawful coercive intrusion into employee affairs." The Board noted the "broad inquiry into the union sentiments of the employees," implying less than complete knowledge on the part of the company, and further inferred some trepidation from Giengerich's "cautious answer."
 
 
 11
 About two weeks later, on September 30, Warren, a superintendent, stated during a discussion with employee Schrock that President Hussey had been in the mobile home business too long and would do something to discourage the union committee and the employees. Two months later, Warren asked Schrock if he were going to a meeting of the union committee. When Schrock replied that he was, Warren said that if Schrock did go he would be "the craziest fool that works at Liberty Coach." Again relying on the "non-coercive setting" at the plant, the trial examiner found that Warren's statements were not implied threats of reprisal, and would not tend to restrain the employees in their support of the union. Noting the obvious threatening connotations of the remarks, the Board reversed the trial examiner.
 
 
 12
 In our view, the Board's conclusion that the three conversations violated Section 8(a) (1) is supported by substantial evidence.[7] The Weaver-Giengerich encounter presents a close case, but an atmosphere of anti-union animus is established by the Newby dismissal and the later threats from Warren to Schrock which somewhat undercuts the examiner's finding that union activity was free and open. In these circumstances we affirm the Board's findings.
 
 III
 
 13
 This brings us to the central issue in the case: the validity of the proceedings, chief among which was a secret ballot election, which led to the certification of the union. On September 27, 1966, the union filed with the Board a petition for an election at the plant. Before the Board passed upon the petition, the union and the company entered into a "Stipulation for Certification upon Consent Election" which defined the agreed bargaining unit.[8]
 
 
 14
 The election was held on October 28, 1966, and resulted in a tie, with 94 votes cast for and 94 cast against the union. The ballots of two additional employees were challenged by the company as not falling within the stipulated unit, and were sealed. Both the union and the company filed objections to the pre-election conduct of the other party. The union charged that the company had manipulated the employees' production bonus, and had threatened reprisals against the employees if the union won the election. The company denied the charges and claimed that the union had improperly affected the election by making such false charges to the employees during the campaign.
 
 
 15
 In accordance with the Board's rules, the Regional Director made an investigation into the objections and into the status of the employees whose ballots had been challenged.[9] In his report to the Board, the Regional Director found: first, that the union's charges were unsupported; and second, that the company's objections to pre-election dissemination should be rejected variously because the false charges were "not objectionable on their face," because the company had time to respond to them, and because the union had not been shown to have been responsible for disseminating them. The Regional Director found that the employees whose ballots were challenged should not be included within the stipulated unit.
 
 
 16
 Thus the Regional Director's recommendation was that the election be allowed to stand, and that the challenged ballots not be counted. The result of the election would then be a tie, and the union would not be certified. Though the company was the winning party under the Regional Director's recommendations, it filed protective exceptions,[10] challenging the Regional Director's finding that the union's pre-election misrepresentations had not prejudiced the election itself.[11] It submitted a large quantity of evidence, which it claimed showed the error in the Regional Director's conclusion that the union's misstatements had been non-prejudicial.[12]
 
 
 17
 Without reviewing the evidence submitted or holding a hearing, the Board reversed the Regional Director's unit determination and ordered that the disputed ballots be opened and counted. At the same time, and also without a hearing, it adopted the Regional Director's recommendation that the company's objections to the election, based on the union's false statements, be overruled.
 
 
 18
 Pursuant to the Board's order, the two challenged ballots were opened at the Board's offices on May 16, 1967. Both employees had voted for the union. Physical irregularities were noticed in both ballots, and the company challenged them on the ground that their secrecy had been violated. Again the Regional Director made an investigation and recommended that one of the ballots should be accepted, which would decide the election in favor of the union by one vote, and would make a decision on the validity of the other ballot unnecessary. The Board adopted the recommendation, and finally certified the union as the bargaining representative of the Liberty Coach unit.
 
 
 19
 On appeal, the company challenges the certification on three grounds: first, that its exceptions to the Regional Director's first report raised material questions of fact relevant to its objections to the union's pre-election conduct, so that the Regional Director's findings on that issue could not be adopted by the Board without a hearing; second, that the Board erred as a matter of law in reversing the Regional Director and including the disputed employees in the unit without a hearing on the intent of the parties; and third, that those employees' ballots should have been disqualified as in violation of the statutory requirement of a secret ballot election.
 
 
 20
 A. The company's first argument is that it never received a proper hearing on its claim that the union's false charges made a fair election impossible. The Board's rules provide that when objections are filed to a consent election or when the number of challenged ballots is large enough to affect the result of the election, the Regional Director "shall investigate such objections or challenges, or both," and "shall prepare and cause to be served on the parties a report on challenged ballots or objections, or both, including his recommendations, which report, together with the tally of ballots, he shall forward to the Board in Washington, D. C." 29 C.F.R. § 102.69(c). Within ten days, any party objecting to the report may file exceptions with the Board. Ibid.
 
 
 21
 "* * * [I]f exceptions are filed * * * and it appears to the Board that such exceptions do not raise substantial and material issues with respect to the conduct or results of the election, the Board may decide the matter forthwith upon the record * * *. If it appears to the Board that such exceptions raise substantial and material factual issues, the Board may direct the regional director or other agent of the Board to issue and cause to be served on the parties a notice of hearing on said exceptions before a hearing officer."
 
 
 22
 29 C.F.R. § 102.69(e).
 
 
 23
 This latter rule has been held to require the Board to hold a hearing where substantial factual issues are raised,[13] despite its apparently permissive language ("the Board may direct * * * a * * * hearing"). We concur in this reading, especially where, as here, the Board does not allow relitigation of the validity of the election in the refusal to bargain proceedings which follow.[14] The Regional Director's investigation and report is not an adversary proceeding or an adjudication in the usual sense, and yet it may determine crucial issues of fact or mixed law and fact which will underlie a future unfair labor practice determination. Congress' presumed sense of due process tradition, if not the command of the Constitution, thus supports the principle that an adversary hearing must be held at some point in the process where genuinely contested factual issues are properly raised.
 
 
 24
 On the other hand, the Board has the duty of implementing the statutory policy in favor of collective bargaining,[15] and thus of expediting resolution of "questions preliminary to the establishment of the bargaining relationship."[16] Congress has underlined the policy of expedition by providing no review in the Courts of Appeals from certification decisions of the Board, American Federation of Labor v. N.L.R.B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940),[17] and only in the clearest cases of violation of the statutory mandate can such actions be reviewed by suit in a District Court. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).
 
 
 25
 Pursuant to this policy of expedition, an aggrieved party is required to present his exceptions to the Regional Director's factual findings promptly, and in manageable, clear and concise form. The applicable principles have been well stated by Judge Cecil:
 
 
 26
 "In order to raise `substantial and material factual issues', it is necessary for a party to do more than question the interpretation and inferences placed upon the facts by the Regional Director. * * * It is incumbent upon the party seeking a hearing to clearly demonstrate that factual issues exist which can only be resolved by an evidentiary hearing. The exceptions must state the specific findings that are controverted and must show what evidence will be presented to support a contrary finding or conclusion. * * Mere disagreement with the Regional Director's reasoning and conclusions do not raise `substantial and material factual issues.' This is not to say that a party cannot except to the inferences and conclusions drawn by the Regional Director, but that such disagreement, in itself, cannot be the basis for demanding a hearing. * *"
 
 
 27
 N.L.R.B. v. Tennessee Packers, Inc., Frosty Morn Division, 6 Cir., 379 F.2d 172, 178 (1967).
 
 
 28
 In this case, the company excepted to the Regional Director's conclusion that false charges made against the company did not require that the election be set aside. The Regional Director offered as grounds for his conclusion (1) that the statements made were "not objectionable on their face"; (2) assuming that they were, that the company had adequate time to reply; and (3) that no agency relationship had been shown between employees making these statements and the union. With respect to alleged misleading union statements, the Regional Director found that the use of the names of two employees who the company claimed had not authorized such use was not seriously misleading, because one had in fact signed his name to an organizing committee list, and the other did not object to the use of his name. With respect to a supposed inducement offered by the union (waiver of initiation fee), the Regional Director concluded that a fair reading of the document in question lead to the conclusion that the waiver of fee was not conditioned on how the employees voted.
 
 
 29
 The company's exceptions to the Regional Director's findings and conclusions read, in pertinent part, as follows:
 
 
 30
 "* * * The Employer submits that the record demonstrates that, in addition to being objectionable on their face, the statements therein are grossly untrue, deliberately made with the purpose of illegally influencing the election, and did so.
 
 
 31
 "All of the Employer's objections are supported and uncontradicted by the evidence and each act objected to unduly and illegally influenced the election.
 
 
 32
 "The premise by the Regional Director that even assuming that Exhibits 1 through 7 were objectionable, that the Employer had ample time to reply to the matters, is completely unfounded and without regard to the practical nature and requirements of a response. Certainly, as was pointed out in prior correspondence to the Regional Director, these accusations were not made by Liberty employees, and the sworn testimony amply demonstrates that fact. Yet, they were published under the guise that they were issued by employees of Liberty Coach. Moreover, the scope of the charges issued but several days prior to the election was such that they could neither have been investigated or properly treated with by the Employer in any manner of convincing rebuttal that would serve to eliminate their highly prejudicial affect [sic] prior to the election."
 
 
 33
 The company now argues that these exceptions were sufficient to require the Board to hold an evidentiary hearing to reconsider the facts underlying the Regional Director's conclusions. Mere reference to the principles set out above is sufficient to rebut this argument. The company did not "clearly demonstrate that factual issues exist which can only be resolved by an evidentiary hearing." The exceptions do not "state the specific findings that are controverted" and "show what evidence will be presented to support a contrary finding or conclusion." Indeed, the exceptions "do [no] more than question the interpretation and inferences placed upon the facts by the Regional Director."
 
 
 34
 The lack of specificity of the exceptions is in no way cured by the company's references to "the record" as refuting the Regional Director's findings and conclusions. There is some controversy here over what was or should have been included in the record before the Board.[18] We find it unnecessary to resolve that controversy, for in the absence of more specific guidance from the exceptions the Board is not itself required to rummage through a record in search of material which may controvert the Regional Director's findings. Such guidance was not provided here, and thus the Board was within its discretion in accepting the Regional Director's recommendations without holding a hearing.
 
 
 35
 The company does not now seriously press the contention that, apart from the denial of a hearing, failure to set aside the election was erroneous as a matter of law. Thus we need not discuss in detail the objections the company has raised to the union's conduct. We are satisfied that the Board was within its discretion in adopting the Regional Director's conclusion that this conduct did not vitiate the election, applying the standards approved by this court in the Luxaire case, United Steelworkers of America v. N.L.R.B., 129 U.S.App.D.C. 260, 263, 393 F.2d 661, 664 (1968).[19]
 
 
 36
 B. The company has from the outset claimed that two employees, Richard Timmons and Max Kleinknight, did not come within the stipulated bargaining unit, so that their votes should not have been counted in the election. The unit was stipulated by the parties, with the approval of the Regional Director, as follows:
 
 
 37
 "All production and maintenance employees of the Employer at its Syracuse, Indiana, establishment:
 
 
 38
 "BUT EXCLUDING all office clerical employees, all mobile home haulaway truck drivers, guards, and all professional employees and supervisors as defined in the Act."
 
 
 39
 The company's operation in the Syracuse area consists of three related work areas: a factory, where the mobile homes are manufactured; a haulaway area, where they are placed to be hauled away to distributing outlets by the company's truck drivers; and a garage, manned by Timmons and Kleinknight. The garage is primarily used to service the company's haulaway trucks, though a small portion of its work is the servicing of vehicles used locally between the factory and the haulaway area. It is located some three quarters of a mile from the main factory, outside the boundary of the town of Syracuse in the village of Wawasee.
 
 
 40
 In establishing a bargaining unit after petition, the Board has broad discretion within which it may choose any "appropriate" unit.[20] However, in the case of a consent election the Board is bound by the parties' stipulation of the unit, unless that unit is inherently inappropriate as a matter of law.[21] Only where the parties' stipulation is ambiguous may the Board turn to consider the usual factors governing the "appropriate unit" in determining whether employees fall within or without the unit.[22]
 
 
 41
 Here the Board's delegate on the scene was the Regional Director. He acted for the Board in approving the negotiated bargaining unit. When Timmons' and Kleinknight's ballots were challenged on the day of the election, he made the initial investigation and report on those challenges.
 
 
 42
 The Regional Director apparently regarded the language of the stipulation as too ambiguous in itself to determine whether the mechanics were within or without the unit. Turning to extrinsic evidence of the parties' intent, the Regional Director, who had supervised the negotiations of the stipulation, noted that "[t]here was no discussion of the garage mechanics between the parties or with the Board prior to the pre-election conference * * *." Thus the Regional Director was left to consider the factors bearing on the appropriateness of including Timmons and Kleinknight in a unit with the plant production and maintenance workers. He found no substantial community of interest between the garage mechanics and the plant workers. The mechanics received substantially higher pay, checked in at a different time clock and indeed had little contact with factory employees, worked a different week, and did not share in the production bonus which was a substantial incentive to the plant workers. The mechanics were supervised separately from the other workers, and indeed worked under much looser control; they were allowed to buy small parts at their discretion, to maintain a running inventory, and to keep the keys to the garage. On the basis of all these facts the Regional Director found that Timmons and Kleinknight should not be included in the unit.
 
 
 43
 The Board reversed and included the mechanics in the unit without holding a hearing. It did not challenge the Regional Director's conclusion that on balance Timmons and Kleinknight would more appropriately be left outside the unit. Rather it inferred from the stipulation itself an intent to include them, thus making de novo inquiry into "appropriateness" unnecessary.
 
 
 44
 The Board noted that the union had initially petitioned the Board for a unit described as including "`All production and maintenance employees at the Company's plant in Syracuse, Indiana', and excluding `All truckdrivers, guards, professional, technical, and salaried employees, and supervisors as defined in the Act.'" (Emphasis by the Board.) The Board noted that when the stipulation was negotiated "`plant' was changed to `establishment', and `all truckdrivers' became `all mobile home haulaway truckdrivers'." In the Board's view, these changes showed "an intent to cover the entire business unit of the Employer and to exclude only those narrower categories of employees so specified." In the Board's view "[t]hat `production and maintenance employees' is meant as a general term is evidenced by the inclusion of local truckdrivers within the unit." Finally, the Board concluded, inclusion of Timmons and Kleinknight within the unit would not be "inherently inappropriate as a matter of law," so that the inferred intent of the parties to include them should be given effect.
 
 
 45
 The company petitioned the Board for reconsideration of this decision, urging that the Board had decided an issue of fact (the intent of the parties as to the scope of the stipulated unit) without holding a hearing, so that the evidence of an intent to exclude had not been heard. In an accompanying brief, the company summarized the evidence it would proffer on the question of intent, evidence which was contained in the "record" which the company had presented to the Regional Director and which had been used by him, but which had not been forwarded to the Board.[23]
 
 
 46
 Among this evidence was the following: First, the company asserted that there had been no negotiation or communication between the company and the union concerning the garage mechanics before the stipulation was entered into, and that the company had placed no importance upon the use of the word "establishment" rather than "plant" in the stipulation. Second, as to the union's intent, the company alleged that a union representative had talked to Timmons and Kleinknight before the petition was filed, and had told them that they would be included in the unit if the haulaway truck drivers were also included. If this is true, the exclusion of the truck drivers from the unit petitioned for is substantial evidence of union intent to exclude the garage mechanics. Third, and most significant, after the stipulation was agreed upon, the company provided a list of employees eligible to vote to the union some three weeks before the election. This list did not include the names of Timmons and Kleinknight, indicating that the company did not view them as within the unit. The union made no objection. Only at the pre-election conference, less than an hour before the scheduled balloting, did the union representative for the first time raise the possibility that the mechanics might vote.
 
 
 47
 In its order denying reconsideration, the Board stated:
 
 
 48
 "The Board has fully considered the facts alleged and arguments made in the Employer's motion and brief, and has accepted the said facts as true for the purposes of the motion. The Board finds that the facts as alleged fail to provide a basis for disturbing the Board's original findings and conclusions, and that the Employer's contentions do not raise material and substantial factual issues which should be resolved at a hearing."[24]
 
 
 49
 We cannot agree. In our view, if the company's allegations on motion for reconsideration were true, it would have been arbitrary for the Board to have determined that the parties intended in their stipulation to include Timmons and Kleinknight within the stipulated bargaining unit. Thus those allegations raised material and substantial factual issues as to the parties' intent, and a hearing was required.
 
 
 50
 First we note that the stipulation itself was patently ambiguous on the inclusion or exclusion of the mechanics. On the union's side it might be urged that the general term "production and maintenance employees" should include the garage mechanics, who are after all engaged in maintenance, and that the necessary implication of the exclusion of office and clerical workers and haulaway truck drivers is that all employees encompassed by the general definition and not explicitly excluded are to be included. On the company's side it can be argued that the garage is not in Syracuse, but rather in Wawasee; and that the exclusion of the haulaway drivers, with whom the mechanics are chiefly concerned, implies exclusion of the mechanics.
 
 
 51
 These arguments from the unadorned and unilluminating text are obviously not persuasive on either side of the controversy. Thus the Board quite properly looked outside the four corners of the stipulation in order to ascertain the intent of the parties, if any could be ascertained. But the Board looked to only one item of extrinsic evidence — the union's earlier petition. From the change in wording from "plant" to "establishment" and from "truckdrivers" to "mobile home haulaway truckdrivers," the Board inferred an intent to broaden the scope of the bargaining unit, so that if the text of the stipulation alone could not clearly reach out to Wawasee, the text supplemented by the previous petition could.
 
 
 52
 Once the Board opened up extrinsic evidence of the intent of the parties, in all fairness it had to look at the evidence on both sides. The company came forward with allegations which, if believed, would impressively support a conclusion that the original intendment of the parties was to exclude the garage mechanics.
 
 
 53
 We need not, and do not, hold that if the company's allegations are true the Board must conclude that the parties intended to exclude Timmons and Kleinknight. Rather we hold that, if those allegations are true the Board could not reasonably conclude on the whole record that the intent was to include the mechanics. There remains the third possibility — a determination that the evidence is inconclusive on the question of the intent of the parties, so that a de novo approach to the appropriateness of including the disputed employees within the unit must be made. This was the line taken by the Regional Director, and the Board has not yet considered his recommendation that Timmons and Kleinknight should be excluded from the unit on a de novo determination of appropriateness.
 
 
 54
 Since the determination of a violation of Section 8(a) (5) rested upon a finding that the company had refused to bargain after the union had been validly certified, the case must be remanded to the Board for further proceedings, not inconsistent with this opinion, to determine if Timmons and Kleinknight were properly included in the bargaining unit.
 
 
 55
 C. A finding that Timmons and Kleinknight were validly included cannot in itself validate certification of the union, for there remains the question of their contested ballots, which in our view also requires further proceedings if the unit question should be decided favorably to the union.
 
 
 56
 At the original election, the Board agent challenged Timmons' and Kleinknight's ballots because the employees were not on the voting list prepared for the election. According to general practice in such cases, the ballots are sealed in special envelopes. The main portion of each envelope is marked "Challenged Ballot" on top and "Secret Envelope" on the bottom, and into this portion the ballot is placed. Attached to each envelope by perforation is a stub upon which the name of the employee, the date, and the reason for challenge are noted. It appears that where challenges to ballots are overruled, the stubs are removed, the main portions of the envelopes are shuffled, and only then are the ballots removed, so that their secrecy can be preserved.
 
 
 57
 In this case, when the Timmons and Kleinknight ballots came to be opened after the Board had included them in the unit, Timmons' name was written not only on the stub attached to the envelope, but on the main part — clearly marked "Secret" — of the envelope itself. Although Kleinknight's secret envelope was properly unmarked, two corners had apparently been torn off the ballot itself.
 
 
 58
 The company rechallenged both ballots, arguing that the secrecy of election mandated by the Act[25] had been violated. In his report and recommendation, the Regional Director held as follows:
 
 
 59
 "The untorn ballot in question clearly reflects the voter's intent and contains no identifying marks and is, therefore, a valid ballot. Assuming arguendo that this ballot was in the challenge envelope bearing Timmons' name, such a marking on the envelope does not interfere with the secrecy of the ballot. N. A. Woodworth Company, 115 NLRB 1263, 1265, and `the fact that a voter's identity may be publicly known as an unavoidable result of the challenge procedure, does not invalidate his vote in the determination of the election results.' Prestige Hotels, Inc., 125 NLRB 207, 208.
 
 
 60
 "In view of the resolution of the challenge to the untorn ballot made above, it is unnecessary to resolve the challenge to the torn ballot * * *."
 
 
 61
 (Footnotes omitted.) The company excepted to the report, but the Board adopted its recommendation without further comment.
 
 
 62
 In our view, the Board through its Regional Director misapplied the applicable law with respect to disqualification of ballots for lack of secrecy. In its brief on appeal, the Board states the proper standard: "[A] marking which appears to have been deliberately made and which may serve to identify the voter renders the ballot void." N.L.R.B. v. National Truck Rental Co., 99 U.S.App. D.C. 259, 263, 239 F.2d 422, 426 (1956), cert. denied, 352 U.S. 1016, 77 S.Ct. 561, 1 L.Ed.2d 547 (1957). The point of the rule is to eliminate all ballots which the voter appears to have tried to identify as his own, giving rise to the implication that he may be complying with the threats or satisfying the inducements of one of the parties to the election. As the Board says in its brief, ballots are disqualified where "the voter apparently wanted to be identified with his vote." (Emphasis by the Board.)
 
 
 63
 Thus not every possibly identifying mark serves to disqualify a voter. In the case cited by the Regional Director, N. A. Woodworth Co., 115 NLRB 1263, 1265 (1956), the Board's agent let his writing spill over from the stub on to the secret portion of the envelope, thus rendering the ballot possibly identifiable. This did not indicate any intent by the voter to identify his vote, and thus was not disqualifying.
 
 
 64
 Here the allegation was not that the Board agent had written Timmons' name on the envelope, but rather that Timmons himself had. The Regional Director made no finding whether Timmons or someone else wrote his name on the envelope, apparently regarding the question as irrelevant. But if Timmons himself wrote his name on the envelope, clearly marked "Secret," the natural inference would be, in the absence of explanatory circumstances, that he had done so for the purpose of identifying his vote.
 
 
 65
 If the statutory requirement of a secret ballot election is to be met here, the Board must satisfy itself either that Timmons did not write his name on the envelope, or that he did so in circumstances which could reasonably be said to negative any improper intent to identify his vote. If Timmons' ballot cannot qualify under these standards, the Board must consider whether Kleinknight's torn ballot is valid under the same standards. If neither ballot qualifies, then even if Timmons and Kleinknight were properly included in the unit, the certification issued to the union on the basis of this election cannot stand.
 
 
 66
 Insofar as the Board's order rests upon violations of Sections 8(a) (1) and 8(a) (3), it will be enforced. The case is remanded to the Board for further proceedings not inconsistent with this opinion.
 
 
 67
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 The Board's rules provide:
 "Where a petition has been duly filed, the employer and any individuals or labor organizations representing a substantial number of the employees involved may, with the approval of the regional director, enter into an agreement providing for a waiver of hearing and a consent election leading to a determination by the Board of the facts ascertained after such consent election, if such a determination is necessary. Such agreement shall also include a description of the appropriate bargaining unit * * *."
 
 
 [29]
 C.F.R. § 102.62(b) (1969)
 
 
 [2]
 29 U.S.C. § 158(a) (5) (1964)
 
 
 [3]
 29 U.S.C. § 158(a) (3) (1964)
 
 
 [4]
 29 U.S.C. § 158(a) (1) (1964)
 
 
 [5]
 Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [6]
 Oil, Chemical & Atomic Wkrs. Int. U., Local 4-243 v. N.L.R.B., 124 U.S.App. D.C. 113, 115-116, 362 F.2d 943, 945-946 (1966)
 
 
 [7]
 Universal Camera Corp. v. N.L.R.B.,supra Note 5.
 
 
 [8]
 The stipulation of an appropriate unit by the parties, subject to approval by the Regional Director of the Board, is provided by Board Rule 102.62(b),supra Note 1.
 
 
 [9]
 "If objections are filed to the conduct of the election or conduct affecting the result of the election, or if the challenged ballots are sufficient in number to affect the result of the election, the regional director shall investigate such objections or challenges, or both. * * *"
 
 
 [29]
 C.F.R. § 102.69(c) (1969)
 
 
 [10]
 Under Board rules, the Regional Director's post-election report constitutes a preliminary finding of fact and conclusion of law, which becomes final if not challenged before the Board by exceptions. The Board grants a hearing only if the exceptions "raise substantial and material factual issues." 29 C.F.R. § 102.69(e) (1969)
 
 
 [11]
 The "protective exceptions" filed by the winning party were to cover the eventuality that the Board might reverse the Regional Director's determination that the two disputed employees were not within the bargaining unit — as in fact the Board did
 
 
 [12]
 The Regional Director's "investigation" of objections to conduct of the election and of challenges to ballots is just that — an investigation. It is not an adversary proceeding and there is no hearing in the usual sense. In this case the company apparently was concerned that the Regional Director's investigation had been too superficial, and it prepared on its own initiative and submitted to him a substantial volume of sworn testimony on the issues of the union's pre-election conduct and the inclusion of the disputed employees in the bargaining unit
 
 
 [13]
 E. g., Sonoco Products Co. v. N. L. R. B., 9 Cir., 399 F.2d 835 (1968); N. L. R. B. v. Bata Shoe Co., 4 Cir., 377 F.2d 821, cert. denied, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967).
 
 
 [14]
 More than one court has held that error in denying a hearing in the representation proceedings is cured by a hearing on the same issues in the proceedings on the subsequent charge of a § 8(a) (5) violation. N. L. R. B. v. Bata Shoe Co.,supra Note 13; N. L. R. B. v. O. K. Van Storage, Inc., 5 Cir., 297 F.2d 74 (1961).
 
 
 [15]
 Some courts forget that Congress has not directed the Board to be neutral on the question of collective bargaining, but on the contrary has stated:
 "It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining * * *."
 29 U.S.C. § 151 (1964). (Emphasis added.)
 
 
 [16]
 N. L. R. B. v. O. K. Van Storage, Inc.,supra Note 14, 297 F.2d at 76.
 
 
 [17]
 The Act implies this result by indirection in its provision that the record of a representation case be included in any subsequent unfair labor practice case in which the representation decision is in issue. 29 U.S.C. § 159(d) (1964)
 
 
 [18]
 The testimony gathered by the company and presented by it to the Regional Director,see Note 12 supra, was not included in the record sent by him to the Board. The Board's rules provide that if no hearing is held the Board is to decide the matter "upon the record." 29 C.F.R. § 102.69(e). What is to be included in the record, as established in 29 C.F.R. §§ 102.68 and 102.69(f) (1969), is set out in terms apparently aimed at cases in which the Regional Director does hold a hearing. Thus it includes the "notice of hearing, motions, rulings, orders, stenographic report of the hearing," etc. In addition, the record is to contain "any briefs or other documents submitted by the parties."
 The company argues that the testimony which it offered to the Regional Director, and which he used in his investigation, was "other documents" within the meaning of the rule. This argument gains support from the recent decision of the Fifth Circuit in Southwestern Portland Cement Co. v. N. L. R. B., 407 F.2d 131 (1969). However, as noted in text, we need not determine whether we would follow the Fifth Circuit in this regard, for even if the Board had received the testimony in question as part of the record, it would not have been required to sort through such bulky testimony without more explicit guidance than the company's exceptions provided.
 
 
 [19]
 The testimony not accepted by the Board as part of the record has been lodged with this court pursuant to our order, and in considering the company's subtantive objections to the union's pre-election conduct we have made reference to that testimony
 
 
 [20]
 Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947)
 
 
 [21]
 N.L.R.B. v. Tennessee Packers, Inc., Frosty Morn Division, 6 Cir., 379 F.2d 172 (1967)
 
 
 [22]
 Id. at 182.
 
 
 [23]
 See Notes 12 and 18 supra.
 
 
 [24]
 Thus the Board did not finally stand on the ruling excluding the company's mass of evidence from the record. It received exceptions and a brief summarizing what the company thought was favorable to its case in that testimony and, assuming the summary accurately to reflect the testimony, and further assuming the testimony to be true, it held that no factual issues requiring a hearing had been raised
 The Board thus essentially sustained a demurrer to the company's allegations and, as is always the case in reviewing such a ruling, we take the allegations to be true for our purposes.
 
 
 [25]
 "If the Board finds * * * that a question of representation exists, it shall direct an election by secret ballot * * *." 29 U.S.C. § 159(c) (1) (1964)