**AMERICAN BRIDGE DIVISION, UNITED STATES STEEL CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Steelworkers of America, AFL–CIO, Local Union No. 7637, Intervenor.**

**No. 71–1245.**

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1971.

Decided March 21, 1972.

Leonard L. Scheinholtz, Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (S. G. Clark, Jr., V. L. Matera, Pittsburgh, Pa., on the brief) for American Bridge Div., U. S. Steel Corp., petitioner.

Warren M. Davison, N. L. R. B., Washington, D. C. (Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Madge F. Jefferson, Atty., N. L. R. B., on the brief) for respondent.

James D. English, Asst. Gen. Counsel, United Steel Workers of America, AFL–CIO, Pittsburgh, Pa. (Alfred E. Lawson, Pittsburgh, Pa., George H. Cohen, Bredhoff, Barr, Gottesman, Cohen & Peer, Washington, D. C., Bernard Kleiman, Kleiman, Cornfield & Feldman, Chicago, Ill., on the brief) for intervenor.

David K. McMullin, Pittsburgh, Pa., on brief for Ass'n of Technical & Clerical

Employees, American Bridge Div., Ambridge Plant, amicus curiae.

Before STALEY, ADAMS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

On this appeal we are asked to rule on the propriety of the National Labor Relations Board's amendment to the certification of a bargaining unit's representative to reflect its affiliation with the United Steelworkers of America (USW). The issue is before us on the petition of the United States Steel Corporation, American Bridge Division (the company) to review and set aside an order [1] of the Labor Board issued against the company for refusing to bargain with the new representatives. The Labor Board has filed a cross-application for enforcement of its order.

The bargaining union involved consists of the salaried clerical and technical employees of the company's American Bridge Division plant in Ambridge, Pennsylvania. Since 1946, the unit has been represented by a local and independent labor organization, the Association of Technical and Clerical Employees, American Bridge Division, Ambridge Plant (the association), and its predecessor. During 1969 when the critical events in this case took place, the association had 304 members. They were covered by a collective bargaining agreement negotiated solely between the representatives of the association and the company.

In August 1969 talks began between the association's executive committee and the USW to discuss possible affiliation with the 1,120,000 member international.[2] These meetings were not discussed with the association's members but resulted in a unanimous vote by the executive committee in favor of affiliation.

On September 22, 1969, a notice was mailed to all members of the association informing them that a special membership meeting would be held on October 5, 1969, for the purpose of taking a vote on the matter of affiliation with the USW. The notice stated that the executive committee hoped to be able to present all facts necessary for an intelligent vote on the issue at the meeting and added that representatives of the USW would be present.

Robert Matascik, a former officer of the association, evidently was not satisfied with this limited opportunity to discuss the various advantages and disadvantages of affiliation. On September 25, he presented a petition to the secretary of the association asking for a special meeting in advance of October 5 to discuss the problem. He had gathered 100 signatures on the petition, more than enough to meet the requirement of the association's constitution that 30% of the membership of the association must make a written demand for a special meeting. Notwithstanding this valid request, the executive committee declined to hold such a meeting on the basis that the already scheduled October 5 meeting would provide a full opportunity for debate.

On October 5, 198 of the 304 members of the association attended the meeting. The executive committee presented its views, and the USW representative spoke to the meeting and answered questions.

Upon completion of the question and answer session, the USW representatives were asked to leave the meeting. Six members of the association were appointed a temporary election committee. The members formed a line and received their ballots as they walked past the committee. The committee's members did not have a membership list to check who received a ballot and apparently relied on the fact that only union members

1. The Board's decision and order are reported at 189 NLRB No. 25. The Board's decision and amendment of certification are reported at 185 NLRB No. 98.

2. Directory of National & International Labor Unions in the United States (1970), Bull. 1665, U.S.Dept. of Labor, Bureau of Labor Statistics, 42.

were permitted into the meeting hall. They also could not be sure that only one ballot was handed out to each person, but because the final tally revealed 196 votes for the 198 people who signed the attendance list, there is no evidence that any irregularity actually occurred.

There was no voting booth, and members marked their ballots wherever they could. Although there was no intentional violation of the secrecy of the ballot, members of the association testified that they saw how other members voted. The votes were then placed in a wooden box and counted.

The affiliation was approved 111 to 85, and the USW informed the company of the result. The company refused to ignore the Board's certification of the association and stated that it would not recognize the newly formed local of the USW.

On November 6, 1969, the USW filed a petition to amend the 1946 certification by substituting Local Union No. 7637 of the USW as the certified representative. The Labor Board granted the amendment substituting the name of "United Steelworkers of America, Local Union No. 7637" as the certified union without requiring a Board election. The company has refused to bargain with the union.

The Labor Board recognizes that when there is a "question of representation," it is compelled by § 9(c) (1) of the National Labor Relations Act, 29 U.S.C. § 159(c) (1) (1970), to hold a supervised election to determine whom the covered employees will select as their bargaining agent. However, it contends that where there is no "question of representation," it may amend the certification of the unit during the contract term through the simplified "AC," or amendment of certification, procedure set out at 29 C.F.R. § 102.60 (1971). The Labor Board asserts that a situation presents no "question of representation" where three conditions are met: "(1) the certified union . . . does not oppose the amendment; (2) the bargaining unit remains the same; and (3) the members of the union . . . are given an op-portunity to consider and vote on the question of affiliation through a democratic process and in accordance with the union's constitution and by-laws." It contends all three conditions are present in this case, and that it can validly use the amendment of certification procedure.

Upon a careful review of the record, we cannot agree that the second and third of the above-mentioned conditions are present and must therefore find that the new USW local is not the properly certified representative of American Bridge's salaried, technical and clerical personnel.

The Board in its brief states that "[w]hat is involved in this case is the amendment of the certification to reflect the change in identity of the employees' bargaining representatives from the association to the union." Were the change of identity merely a reflection of a change of name, we would not take exception to the Board's procedures.

The Board's assertion that the union was essentially the same organization with a new title after its affiliation will not withstand scrutiny. It is a far different organization because the people who conduct a substantial part of the unit's dealings with management are no longer the association's officers, and the power of the unit's members to control those agents has radically changed. In other words, there is a clear question of representation: Will the unit's members be represented by their own local officers or by the Steelworkers' Union?

The Association of Technical and Clerical Employees had been certified by the Labor Board as the bargaining agent for its membership in 1946. For almost 25 years, it had functioned continuously as the bargaining representative for the salaried and clerical employees at the Ambridge installation of the American Bridge Division of the U.S. Steel Corporation. By the simple expedient of amending the certification, the Association has been supplanted by an international union as the bargaining representative, and control over the rights of its

members has been transferred from an independent body of slightly more than 300 to an international union having a membership of 1,120,000 members.

The language of the existing contract, the local officers, and the employees covered by the contract may be the same, but the rights of the parties have changed. By virtue of affiliation, the new local becomes subject to the International Constitution of the Steelworkers Union. That constitution makes substantial changes in the rights of the employees to the contract and it affects their obligations to management. Article XVI of the United Steelworkers International Constitution is in point. It provides that: "No strike shall be called without the approval of the International President." Further changes in the rights of the parties are affected by Article XVII of the same Constitution. Under Section 3 of that Article, the presentation, adjustment and settlement of grievances and the settlement of all other matters relating to terms and conditions of employment or arising out of employer-employee relations become vested in the International Union and the local union. Because of the provisions of Section 2 pertaining to checkoff clauses in the collective bargaining agreement, payments now due from the company shall be remitted to the International Secretary-Treasurer and not the association.[3]

Of equal significance is Section 1 which establishes that the local's members will effectively be represented in collective bargaining by the International Union. The International will have the power to determine when a strike can be called and when a contract will be signed.

This may or may not be an advantage to the employer but it is definitely a change in the question of representation. The very act of affiliation here is a commitment to change in the fulcrum of union control and representation. There is a clear departure from the former status of an independent union, where local officers negotiated the contract, settled the terms, handled the grievances and decided when and when not to strike, and where employees in the bargaining unit alone fixed their dues, fines and assessments. Important powers thus have been transferred to the officers of the International Union, who carry responsibility for the overall interests of the 1,120,000 members of the union and not necessarily the primary interests of the 304 salaried clerical and technical personnel at Ambridge.

This substantial departure from the previous rights and duties of the local's members and their officers may well raise serious discontent among the employees. Minimizing such labor unrest was one of the critical purposes that prompted the creation of Board sponsored representation (including decertification) elections. Section 9(c) elections are to provide assurance to the parties in interest that when a collective bargaining representative is designated, workers, management, and the public can all rest assured that it is the free and uncoerced choice of the majority of employees in the bargaining unit. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. NLRB, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50 (1940); Schmerler Ford, Inc. v. NLRB, 424 F.2d 1335, 1339 (7th Cir. 1970); NLRB v. David Buttrick Co., 399 F.2d

---

3. Article XVII of the United Steelworkers International Constitution provides for the following:

Section 1. The International Union shall be the contracting party in all collective bargaining agreements and all such agreements shall be signed by the International Officers.

Section 2. Where check-off clauses are contained in collective bargaining agreements, they shall provide that the Company shall make the check payable to and be sent to the International Secretary-Treasurer.

Section 3. The International Union and the Local union to which the member belongs shall act exclusively as his agent to represent him in the presentation, maintenance, adjustment, and settlement of all grievances and other matters relating to terms and conditions of employment or arising out of the employer-employee relationship.

505, 507 (1st Cir. 1968). As this court noted in NLRB v. Western & Southern Life Insurance Co., 391 F.2d 119, 123 (3d Cir. 1968), "the overriding policy of the Act is in favor of the interest in employees to be represented by a representative of their own choosing for the purposes of collective bargaining . . . ." Neither the Labor Board nor this court may deprive workers of an electoral process which will almost certainly guarantee an accurate representation of their views in any case where there is a palpable difference in the kind of representation an employee will receive before and after the amendment of certification. To do otherwise would be to run the undesirable and unacceptable risk that a bargaining agent who was not the true choice of the majority of the bargaining unit would improperly gain certification. Such a result would obviously defeat the purposes of the Act in general and Section 9 in particular, and would not be in the best interests of either labor or management.

■ Previous cases which have considered the amendment of certification procedure concur that it is proper where there is merely a change in the name of the organization. The Second Circuit in Cocker Saw Co. v. NLRB, 446 F.2d 870, 872 (2d Cir. 1971), held: "An amendment to a certification is proper only to permit changes in the name of the representative, not to change the representative itself." cf. NLRB v. Mulligan of Dearborn, Inc., 434 F.2d 1052 (6th Cir. 1971). To permit the procedure to cover additional situations involving significant changes in the actual identity of the representatives and a diminution in the rights of the bargaining units' members without a Board-sponsored election exceeds the scope and purpose of the Board's own rules and is contrary to the

sound legislative policy behind Section 9 of the National Labor Relations Act.

■ There is a secondary but important issue which warrants consideration. Were the election procedures that substituted for the Board-supervised vote designed to provide—and did they in fact give—the workers in the bargaining unit freedom of choice and the *"opportunity to consider* and vote on the question of affiliation" referred to by the Labor Board? (emphasis supplied) We think not.

We do not reach the question of whether this court should permit an amendment involving only a change in the organization's name where the union's procedures are as good as the Labor Board's "ideal electoral conditions." Dal-Tex Optical Co., 137 N.L.R.B. 1782, 50 L.R.R.M. 1949 (1962). In this case it is clear that those conditions were not met.[4] Robert Matascik presented a petition for a special meeting to discuss the affiliation vote prior to the date of the vote, October 5th. Although his petition had a sufficient number of signatures and in all other ways met the association's requirements for calling a special meeting, the request was denied. Instead, the association's officers believed that it was adequate for the members to be permitted to discuss the issue at the October 5th meeting, just before the vote. We cannot agree.

When the affiliation vote was taken at the Ambridge plant, the rank and file member was faced with two distinct alternatives: (1) retain all power over negotations and strikes in the hands of the local; or (2) join the International Steelworkers and give their officials the final word over the contract and over strikes. The comparative advantages and disadvantages of the two proposals were complex, requiring thoughtful consideration by everyone affected. The constituency

---

4. Although this case comes to us as an unfair labor practice proceeding against the employer, we believe that it is perfectly proper for it to raise the various deficiencies in the electoral process. It is as important for the employer, as for the employees, to have a bargaining representative which truly represents the employees. If it does not represent the employees, the collective bargaining agreement is not likely to insure labor peace. The employer will be hurt by the unrest as much as the employees will be.

of those charged with negotiating and calling strikes in the International is 4,000 times as large as it is in the association. The competing interests and political pressures they face are accordingly different, as are the resources they have at hand for the economic struggle. It may well make a great difference to a worker at Ambridge which of these two types of bargaining situation governs when his next contract is negotiated.

Those opposed to the affiliation wanted an opportunity to present their case to the rest of the membership and give them time to reflect on the arguments they presented. The Board agrees with this approach in its own elections and has adopted a policy prohibiting union or management speeches within 24 hours of election time because "last minute speeches delivered to massed assemblies of employees have an unwholesome and unsettling effect and tend to interfere with that sober and thoughtful choice which a free election is designed to reflect." Peerless Plywood Co., 107 N.L. R.B. 427 (1953); cf. Honeywell Inc., 167 N.L.R.B. 647 (1967); Peachtree City Warehouse Inc., 158 N.L.R.B. 1031 (1966). That period of reflection was certainly an element of "the opportunity to consider" all parties concede is necessary here, and it might have made a significant difference in an election such as this one, where a change of fourteen votes would have reversed the result. Matascik's request should have been granted.

Finally, the lack of secret ballot was in derogation not only of the procedure established by the Board's regulations for its elections, 29 C.F.R. § 102.69 (1971),[5] but also of the requirement of Section 101(a) (3) of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a) (3), that requires a secret ballot to approve an increase in the dues rate.[6] Steib v. New Orleans Clerks and Checkers Local No. 1497, 436 F.2d 1101 (5th Cir. 1971); Sertic v. Cuyahoga, Lake Geauga and Ashtabula Counties Carpenters District Council, 423 F.2d 515 (6th Cir. 1970). Section 3(k) of that Act, 29 U.S.C. § 402(k), defines secret ballot as "the expression . . . of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed." The Department of Labor, which is charged with enforcing the same secret ballot provisions with regard to internal union elections, has taken the position that the definition in Section 3(k) requires that there be no possibility that any one would be able to determine how a member's vote was cast. Shultz v. Local 420 Aluminum Workers Union, 74 L.R.R.M. 2281 (N.D.N.Y. 1970).[7] The voting in this case did not come close to meeting that test. Ballots were marked in the open, and it is conceded that officers knew how some of the votes were cast. This violation further reinforces our conviction that the procedures were deficient in providing a fair opportunity for the members to consider all the vital issues confronting them.

Enforcement of the Board's order will be denied and the case remanded to the Board for further proceedings consistent with this opinion.

---

5. See, e. g., International Union of Electrical, Radio, and Machine Workers AFL–CIO v. NLRB, 135 U.S.App.D.C. 355, 418 F.2d 1191 (1969); NLRB v. L. B. Foster Co., 418 F.2d 1 (9th Cir. 1969).

6. Affiliation with the United Steelworkers made the association's members subject to the International's dues structure. The association's dues were $1.50 a month (Association by-laws, at 5) while those in a USW local were to be no less than $5.00 and no more than $10.00 a month. (USW By-laws for Local Unions, Art. XII § 2).

7. Beaird, Union Officer Election Provisions of the Labor Management Reporting and Disclosure Act of 1959, 51 Va.L.Rev. 1306, 1309 (1965).