AMALGAMATED CLOTHING WORK-
ERS OF AMERICA, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Winfield Manufacturing Company, Inc.,
Intervenor.

WINFIELD MANUFACTURING COM-
PANY, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Amalgamated Clothing Workers of Amer-
ica, Intervenor.

Nos. 22501, 22637.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 10, 1969.

Decided Feb. 2, 1970.

Mr. Robert T. Snyder, New York City, with whom Mr. Jacob Sheinkman, New York City, was on the brief, for petitioner in No. 22,501 and intervenor in No. 22,637.

Mr. Robert H. Loeb, Birmingham, Ala., for petitioner in No. 22,637 and intervenor in No. 22,501.

Mr. Ian Lanoff, Attorney, National Labor Relations Board, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, for respondent. Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Elliott Moore, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

ROBB, Circuit Judge:

These cases come to us upon petitions to review by Winfield Manufacturing Company, Inc. (the Company) and Amalgamated Clothing Workers of America (the Union), and a cross application by the National Labor Relations Board for enforcement of a decision and order of the Board issued against the Company. The Board in its decision found that the Company committed certain unfair labor practices in violation of Section 8(a) (1) of the National Labor Relations Act (29 U.S.C. § 158(a) (1)) and violated Section 8(a) (5) and (1) of the Act by refusing to bargain with the Union upon request. The Board's order requires the Company to cease and desist from the unfair labor practices found, and from in any other manner interfering with, restraining or coercing its employees in the exercise of their protected rights. Affirmatively, the Board's order requires the Company to bargain collectively with the Union upon request as the exclusive bargaining representative of all employees in the unit and to post appropriate notices.

The Company contends that the Board's findings are not supported by substantial evidence on the record as a whole. The Company contends further that the Board improperly refused to grant the Company a hearing on its objections to the election which resulted in the certification of the Union. The Union argues that the Board erred in failing to grant the Union's request for retroactive compensatory relief in respect of the Section 8(a) (5) violation and in refusing to grant the "*J. P. Stevens* remedy" requested by the Union

in regard to the Section 8(a) (1) and (5) violations. J. P. Stevens (I) v. N.L.R.B., 380 F.2d 292 (2d Cir.), cert. den., 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967); J. P. Stevens (III) v. N.L.R.B., 406 F.2d 1017 (4th Cir. 1968); J. P. Stevens (IV) v. N.L.R.B., 406 F.2d 1017 (4th Cir. 1968). We affirm the Board's order and grant the cross application for enforcement.

The Company manufactures men's trousers at plants located at Winfield, Alabama, and Golden, Mississippi. The Union conducted separate organizational campaigns at each plant. The campaign at the Winfield plant began in the late summer of 1967 and continued until November 9, 1967, when the Board conducted an election at that plant. The Union won the election. The Company filed timely objections, alleging, so far as material here,[1] that Union representatives and adherents had engaged in conduct which warranted setting aside the election.

The Union's campaign at the Golden plant followed that at Winfield and does not raise a certification issue.

## THE SECTION 8(a) (1) VIOLATIONS

The Board found that the Company committed unfair labor practices in violation of Section 8(a) (1) of the Act in that (1) on the day before the election at the Winfield plant the Company passed out a leaflet entitled "FACTS TO REMEMBER: EXCELLENT REASONS FOR VOTING *NO* IN THURSDAY ELECTION"; (2) the Company distributed a coercive questionnaire to the Winfield employees on the day after the election; and (3) the Company's president Milton Weinsten delivered a coercive and threatening speech to the Golden employees one week after the election at the Winfield plant.

The text of the leaflet distributed to the Winfield employees on the day before the election was:

"1. Who is the Amalgamated Union that is trying to represent you?

ANSWER: The same union that represented the employees of the now *closed* Carbon Hill Mfg. Co. and the Russellville Garment plant. The union that represents Champ-Guin and Arrow where the people were not given their democratic right to vote for or against the union. The union was forced on them by the parent companies.

"2. Is is true that the Puerto Rico plant and Golden plant are union organized?

ANSWER: Positively *not!* The union has tried for 8 months to organize the Puerto Rico plant and they have failed miserably. Our Golden people will not even talk to them.

"3. What type of people has the union assigned as their leaders?

ANSWER: Those that were around when Carbon Hill and Russellville closed. The type that used foul profane language in our plant. The type that threatened to beat up one of our employees because she wouldn't sign a union card. One who would draw compensation against us while working for the union.

"4. Did you need a union to become the highest paid garment workers in our area?

ANSWER: *NO!* Mr. Weinsten set all rates so that you earn .10 to .34 per hour more than all other apparel workers in the area.

"5. Did you have to pay a union to get paid vacations and holiday pay?

ANSWER: *Positively not!* Long before the union came around we promised it to you, and we kept our promise.

1. The Company also objected that it had been required to furnish an election eligibility list pursuant to the doctrine of Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966). The Board's right to require such a list has now been sustained by the Supreme Court of the United States. N.L.R.B. v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed. 2d 709 (1969).

"6. Have you ever needed a grievance committee because our plant managers would not discuss problems with you?

ANSWER: *NEVER!* It is strict company policy to always have our office door open at all times, so that our employees can come in to discuss their work problems with management.

"7. Did you pay a union to get extra break periods as long as production standards were met?

ANSWER: *NO!*

"8. Have you ever heard of an employer like Mr. Weinsten who would risk so much, or at times intentionally lose money, just to get work for his people?

ANSWER: We doubt that you have.

"9. Do you know of one single garment plant in the state of Alabama that has never to this time, had a lay off or worked short hours?

ANSWER: We know of only one. That is Winfield Mfg. Company.

"10. Has any of our employees ever been treated with disrespect?

ANSWER: *Never!* It is strict company policy that all employees regardless of race, religion or color be treated humanely—with respect and with dignity.

"11. If the plant became union what would Mr. Weinsten's personal attitude be?

ANSWER: He positively would not close the plant as long as profitable business was available. However, how do you think he would feel about assuming uncalled for business risks just to keep the people in work? Under very competitive conditions such as we have now, how do you think he would feel about taking contracts at an intentional loss, or to break even, just to keep people in work? These are big questions.

"12. What happened at Carbon Hill Mfg. Co., and at Russellville Garment Factory that as soon as the union came in, the plants closed?

ANSWER: We don't know, *but* it seems too coincidental that successful companies should go out of business as soon as Amalgamated Workers Union gets in.

"13. Do you think the union has any real interest in you?

ANSWER: *POSITIVELY NOT!* If they really had your interests at heart, why didn't they show their faces in 1961, 1962, 1963, 1964 and 1965? Their interest is in *grabbing off $50,-000* each year from our employees, to fatten their fantastically rich treasury.

"14. Can a union get increased wages or benefits just because they promised them to you?

ANSWER: *Positively not!* Unions do not guage [*sic*] wage rates or benefits. The success of a business guages [*sic*] it. No union or court can make a company agree to anything it doesn't want to do, or pay more than it can afford to pay. Any attempt for them to do it, only leads to strikes and lay offs.

"15. Did you employees have to pay union dues in the amounts of $50,000, initiation fees, and various assessments to become the highest paid garment workers in the area, the best working conditions, to be treated with utmost respect, best job security, extra break periods, intelligent problem discussions, paid vacation and holidays, and decent management to work with?

ANSWER: *NO!* Mr. Weinsten, Bill Martin, Buddy Walker and our Mechanics and Supervisors have secured that for you.

### IN CONCLUSION

"I want to state in the most positive, emphatic terms that it is my strong feeling and belief that our company does *not* need a union to interfere with its running of our business. For this reason, I sincerely ask that each and every one of our employees vote *NO* on your ballot!

*REMEMBER*

"If you signed a union card you positively *do not* have to vote for the union. Most of the cards were signed just to get someone off your back. Remember, you are *not* obligated to the union. You should vote *NO* whether a union card was signed or not.

"Ballots are secret—Do not put your name on it.

/s/ Milton Weinsten
Milton Weinsten,
President"

On the day after the election the Company distributed to the employees of the Winfield plant a form containing a number of questions about alleged Union misconduct and misrepresentations during the election campaign. The employees were asked to fill in the blank spaces on the questionnaire and to return it to the company as a signed "personal" letter. Among the questions asked were the following:

"Who talked to you about joining [the] union or voting for [the] union?

"Where did he or she talk to you?

"When did he or she talk to you? Date and time.

"Did he or she promise you anything? What wild promises did he or she make?

"Did he or she threaten you in any manner?

"What pressure did he or she apply to get you to vote and to vote for the union?

"What did he or she say would happen to you in the future if you didn't vote for the union?

"What did he or she say would happen to you in the future if the union won and you didn't vote for it?

"Did he or she say anything to make you feel that you did not have a free and open choice as to how you would vote. What did he or she say?

"Did he or she say that you would be sorry if you did not join and vote for the union?

"Did he or she say that you would lose your job or get less hours of work if you did not join or vote for the union?

"Did he or she say that your job would not be as good in the future if the union won, and you had not joined or voted for the union?

"Did he or she say that you might get hurt, beat up or whipped if you did not join or vote for the union?"

One week after the Union won the election at the Winfield plant President Milton Weinsten addressed the employees at the Golden, Mississippi plant. He began by stating that he was there because "I hate like the devil to see you people make the same mistake that the Winfield people made. I think they made a bad one." He then repeated several times that it seemed "awful coincidental" that two other plants in the neighborhood had closed down "just a short while after the union got in there". He added that the only reason why the Union was attempting to organize the Company's plants was that the Union wanted to collect $50,000 a year from the employees, money for which it would do nothing. As for the Union's organizers, he said that they "are the type that will think nothing of picking up the telephone and calling some of your people * * * that will call you on the telephone and threaten you or threaten your children or something of that sort." He referred to one organizer at Winfield as "the kind of girl that threatened one of our girls right in the factory. She was going to stomp on her, she was going to pull her dress off and beat her up—the kind of girl that used the most foul profane language that I would never dream of using that kind of language. * * * Today she is drawing compensation against Winfield and is still on the payroll of the Union." These themes, that the Union would bring strikes and violence, and that the only interest of the Union was in the dues that could be collected, recurred and were emphasized later in the speech.

A major theme of Mr. Weinsten's speech was that the employees of his plants had not suffered a layoff or been forced to work short hours or weeks, as had been the case in other plants in Mississippi and Alabama. This good fortune he attributed to his practice of scouring the country for orders which would keep the plant working fulltime, a practice which he said involved great financial risks. Explaining his actions in this regard he said:

"I have done these things many times in the past—only for one reason. Not for me. If this place closed down two weeks ago because I didn't have work I wouldn't get hurt, honestly I wouldn't. But I have a feeling for you people out here and that's why I work my darn self in New York and travel all over the country in Philadelphia, California, and every place else where there is a conceivable order to try to bring it to you."

Turning to the situation then confronting the employees he continued:

"What does it all boil down to? It boils down to this. Anybody that feels that they have got to have assistance from arbitration committees, from Unions to work with me, it means only one thing. To me it just means that you have got no confidence in me for anything that I might have done that was nice. There has been no appreciation for any of these things that I am telling you about. * * * I don't ask for any bouquets of flowers but when I do go to Hell and back for somebody I do like to be appreciated for it. And there is absolutely no appreciation in my estimation from people that feel that they have to sign Union cards for Union representation to work with me—to bargain with me. I don't feel that, I just feel that it is a complete lack of confidence and it doesn't sit well with me and I don't mind telling you. You know it is a very easy thing for me to do—it's a very easy thing for me to say—that if I ever had any conditions like that in here there is no court, there is no Un-

ion, there is no nobody that could ever force me to take an order or a contract where I wouldn't make a profit. You know I am in business to make a profit. You know I am not telling you these stories to think that I am just a charitable guy. I am not trying to tell you that. I am in business to make a profit and I have a right to make a profit the same as the drugstore, the same as the cafe and the hardware store in Belmont or Red Bay wherever else it might be. They are in business to make a profit and so am I and if I want to take a cold hard view of things I can do just that. I will take orders that show a profit. I am not telling you that I have been losing money because it is not true but what I am telling you is that there are times that are rough—right now is a time that is rough—right this very minute and if I can do things for you without making a profit—fine, I would be delighted to do it but for anybody who has no confidence in me it is a great big questionmark as to [that's] what I am going to do for them and I don't say that to scare you. I don't say that to put any fear in your heart. Honestly I don't do it for that reason. I am just letting you know a little bit about the insides of Mr. Weinsten. How I think and how I work. That's why I am telling you these things now. If there is no profitable work around what do you do? You just close the doors and when you get work call your people back. * * * You know it better than I do so that's why I keep saying to you that it's not just by accident that Winfield has never had a layoff—why you people have never had a layoff for three years and a few months that we have been here or six years that we have been there. These people tell you that there is a great bit of security—a great bit of security—belonging to a Union. Let me tell you something about security. There is only one thing that makes you people secure and that security comes from success of a business. * * * "

Concluding his speech, Mr. Weinsten remarked that he thought several of the employees had signed union cards and were "sorry about it". For this reason he said he was going to suggest "very strongly", as "the smart thing to do", that employees who had signed cards execute and mail to the Union a letter withdrawing the Union authorization and membership card. Form letters for this purpose were distributed to the employees at the end of the meeting. Emphasizing his "strong suggestion" Mr. Weinsten stated that "I want this Union out of here and I want them off our backs. I don't want to make speeches like this again. I just don't want them around and there is only one way to do it." Finally, he said:

"Of course, it is no secret. All of you people do know that we are out of work. I am trying and I will know on Monday whether my efforts have been successful for getting a contract in here in a big hurry * * * Now there are some very very big contracts coming up but I am working on something special. I am not guaranteeing that I am going to get it. I am trying and I might be able to get it very, very shortly so just be assured that those of you that have already been let out or will be finishing up shortly that we are going to call you back just as fast as we possibly can."

■■ Mr. Weinsten's speech and the leaflet distributed to the Winfield employees speak for themselves. It is enough to add that the Board not unreasonably found that these statements went beyond any legitimate prediction or proper expression of views permitted an employer by the constitutional guarantee of free speech or by Section 8(c) of the Act (29 U.S.C. § 158(c)). See International Union, United Auto, Aerospace, etc., Workers of America, etc. v. N. L. R. B. (Preston Products Co.), 129 U.S.App. D.C. 196, 201, 392 F.2d 801, 806 (1967), cert. den., Preston Products Co. v. N. L. R. B., 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968). Specifically, it was not unreasonable for the Board to conclude that the plain meaning of the Company's words—particularly in the context of its bluntly expressed hostility to unions—was that, if the employees chose to exercise their right of organization the Company could and would retaliate by discontinuing its practice of soliciting marginal contracts to avoid loss of work and by closing the plant. It is established law that "an employer's 'prediction' of untoward economic events may constitute an illegal threat if he has it within his power to make the prediction come true." International Union of Electrical, etc., Workers v. N. L. R. B. (NECO Electrical Products Corp.), 110 U.S.App.D.C. 91, 97, 289 F.2d 757, 763 (1960). See also I. U. A. v. N. L. R. B. (Preston Products Co.), 129 U.S. App.D.C. 196, 392 F.2d 801 (1967), cert. den., 392 U.S. 906, 88 S.Ct. 2058 (1968); N. L. R. B. v. River Togs, Inc., 382 F.2d 198, 202 (2d Cir. 1967). "Conveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof." N. L. R. B. v. Sinclair Co., 397 F.2d 157, 160 (1st Cir. 1968), quoted with approval and affirmed in N. L. R. B. v. Gissel Packing Co., Inc., 395 U.S. 575, 618–619, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Further, the employees were warned of the futility of joining the Union because the Union would only bring strikes and violence without benefit to them. Finally, Mr. Weinsten in his speech plainly solicited and urged the employees to repudiate the Union and provided the necessary information, together with form letters of resignation from the Union, required for them to do so. The Board was justified in finding that such conduct was in violation of Section 8(a) (1) of the Act. Retail Clerks International Assoc. v. N. L. R. B. (Montgomery Ward & Co.), 125 U.S.App.D.C. 389, 391, 373 F.2d 655, 657 (1967); N. L. R. B. v. Priced-Less Discount Foods, Inc., 405 F.2d 67, 69 (6th Cir. 1968); N. L. R. B. v. S & H Grossinger's Inc., 372 F.2d 26, 29 (2d Cir.

1967); N. L. R. B. v. Movie Star, Inc., 361 F.2d 346, 348–349 (5th Cir. 1966). In summary, there is reasonable support in the record as a whole for the Board's conclusion that the Company's communications were either directly coercive or reasonably could be so construed by the employees and hence were unlawful.

The questionnaire, distributed to the employees of the Winfield plant on the day after the election, presents a somewhat closer question. The Company asserts that the information sought by way of the questionnaire was essential to a determination whether the election should be challenged upon the ground that it had been conducted in a coercive atmosphere. Employees were asked to sign their responses, the Company says, because unsigned statements would have been worthless in a proceeding before the Board. It is further argued that the questionnaire was distributed without comment and that no threat to any employee was made in regard to it. The Board, however, found that the interrogation was coercive and in violation of Section 8(a) (1) of the Act.

■ We cannot say that the Board's conclusion with respect to the questionnaire has no reasonable support in the record. As we said in I. U. A. v. N. L. R. B. (Preston Products Co.), 129 U.S. App.D.C. 196, 204, 392 F.2d 801, 809 (1967), cert. den., 392 U.S. 906, 88 S.Ct. 2058 (1968):

"This court has noted that, because of the conflicting interests involved, a delicate balance must be achieved between the employer's need to prepare adequately for pending unfair labor practice cases and the inherently coercive nature (in violation of an employee's Section 7 rights) of employer interrogation of employees during a labor dispute. Joy Silk Mills v. N. L. R. B., *supra*, 87 U.S.App.D.C. [360] at 371–372, 185 F.2d [732] at 743–744. In an attempt to strike such a balance, the Board has 'established specific safeguards designed to minimize the coercive impact of such employer in-

terrogation. Thus, the employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; the questioning must occur in a context free from employer hostility to union organization and must not be itself coercive in nature * * *.' Johnnie's Poultry Co., 146 N.L.R.B. 770, 775 (1964). *Cf.* International Union of Operating Eng., Local 49 v. N. L. R. B., 122 U.S.App.D.C. 314, 316–318, 353 F.2d 852, 854–856 (1966)."

We note in the case at bar that the questionnaire sought to identify every employee who solicited for the Union in any manner, whether proper or improper, and that the employees were not told the purpose of the questionnaire nor were they assured that no reprisals would be taken for Union activity. Furthermore, the leading nature of many of the questions—e. g., "What wild promises did he or she make?"—"What pressure did he or she apply * * * ?"—clearly reflected the Company's hostility to the Union and the Union's efforts to organize the employees. Such manifestations of hostility could not have been conducive to a feeling of confidence or security on the part of those sympathizers or supporters of the Union who were asked to respond to the questionnaire. In short, we cannot say that the Board unreasonably concluded that in the absence of "specific safeguards" the questionnaire was inherently coercive. See I. U. A. v. N. L. R. B. (Preston Products Co.), 129 U.S.App.D.C. 196, 204, 392 F.2d 801, 809 (1967), cert. den., 392 U.S. 906, 88 S.Ct. 2058 (1968); Retail Clerks International Assoc. v. N. L. R. B. (Montgomery Ward & Co.), 125 U.S.App.D.C. 389, 373 F.2d 655 (1967); Texas Industries, Inc. v. N. L. R. B., 336 F.2d 128, 133–134 (5th Cir. 1964).

## THE REFUSAL TO BARGAIN IN VIOLATION OF SECTION 8(a) (5) and (1) OF THE ACT

Pursuant to a stipulation for certification upon consent election the Board con-

ducted an election at the Company's Winfield plant on November 9, 1967. The Union won, 142 to 128, with one vote voided and three challenged. On November 15 the Company filed timely objections, alleging that Union agents, adherents and representatives engaged in conduct which warranted setting the election aside. In support of its objections the Company submitted signed statements in which five employees alleged that fellow employees had threatened them with loss of jobs or benefits or with other reprisals for failure to support the Union, that one employee's production was hindered and that the breather of her car stuffed with cotton as a reprisal, and that two of the five employees were promised jobs at another plant if they voted for the Union and lost their jobs with the Company as a result. The Company alleged that the employees who made the alleged threats and promises had been "speaking for the Union".

The Board's Acting Regional Director concluded that the Company's objections were without merit. He found that the statements submitted in support of the objections "do not justify a finding that the employees alleged to have committed the objectionable conduct held any office in the Petitioner" or that the Union "authorized" or "ratified" the alleged misconduct. He stated further that "none of the conduct complained of occurred on the date of the election and even assuming *arguendo* that the conduct occurred as alleged, such activity by rank-and-file employees was insufficient to create a general atmosphere of confusion or fear of reprisal which rendered impossible a free election". The Acting Regional Director accordingly concluded that the Company's objections "do not raise any material or substantial issues affecting the results of the election" and he recommended that the "objections be overruled in their entirety" and the Union "certified as bargaining representative" of the employees.

The Company filed timely exceptions to the Acting Regional Director's report. In support of its exceptions the Company

filed affidavits from three of the five employees whose unsworn statements had previously been submitted. The affidavits repeated in substance the allegations contained in the unsworn statements. The Company in its exceptions specifically objected to the fact that no hearing was held on the Company's allegation that the Union authorized or ratified the alleged unlawful conduct of the employees. The Board considered the Company's exceptions and found that they raised "no material or substantial issues of fact or law which would warrant reversal of the Acting Regional Director's findings or recommendations." Accordingly, the Union was certified as the exclusive bargaining representative of the Company's employees.

In February 1968 the Company refused to bargain with the Union despite its certification as bargaining representative of the Company's employees. This refusal to bargain was the basis of the Union's charge under Section 8(a) (5) and (1) of the Act, which was consolidated for hearing with the other charges. In its answer the Company alleged that it was "not required to bargain collectively with the Union" because of conduct which interfered with the election and because the Board refused to hold a hearing on the Company's objections. The Company also alleged for the first time that during the period preceding the election the Union sent to prospective voters material stating that those who joined the Union would be covered by Union benefits such as free insurance. This allegation, that the Union promised free insurance, was later incorporated by the Company in an "Amendment to Objections to Election". The amendment was rejected by the Regional Director upon the ground that under Board rules objections to an election must be filed within five working days after the date of the election.

The General Counsel filed a motion for summary judgment on the charge of refusal to bargain collectively. In response, the Company argued that in the unfair labor practice hearing it was en-

titled to litigate the validity of the Union's certification, because it had previously been denied a hearing on its objections to the election. The Company contended also that it was entitled to a hearing to introduce newly discovered evidence concerning improper statements made by Union agents and illegal offers of insurance made by the Union prior to the election. The trial examiner granted summary judgment with respect to the charge of refusal to bargain; he found that since the Company had conceded the refusal to bargain there was no reason to hold a hearing on this issue. With respect to the alleged newly discovered evidence he found that the Company's proffer was too general in nature, and that in any event no explanation was offered as to why this evidence was not discovered or could not have been discovered earlier by the exercise of due diligence. These rulings were subsequently confirmed by the Board.

 The Act entrusts the conduct of representation elections to the Board, which must have wide discretion in controlling and overseeing the election process. N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); N .L. R. B. v. Capital Transit Co., 95 U.S.App.D.C. 310, 311, 221 F.2d 864, 866 n.4 (1955). The only question presented on judicial review is whether the Board has reasonably exercised its discretion in the matter. Pepperell Mfg. Co. v. N. L. R. B., 403 F.2d 520, 522 (5th Cir. 1968), cert. den., 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969). Further, "the burden is on the party objecting to the conduct of the representation election to prove that there has been prejudice to the fairness of the election." Southwestern Portland Cement Co. v. N. L. R. B., 407 F.2d 131, 134 (5th Cir. 1969). And the objecting party must produce "specific evidence" that the election was improperly conducted and that the acts complained of "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." N. L. R. B. v. Golden Age Beverage Co., 415

F.2d 26, 30 (5th Cir. 1969). In short, there is a heavy burden on the Company in showing that the election was improper. We find that the Board acted well within its discretion in finding that the Company did not meet this burden.

The opinion and reasoning of the Circuit Court of Appeals for the Fifth Circuit in N. L. R. B. v. Golden Age Beverage Co., 415 F.2d 26, 32 (5th Cir. 1969) are dispositive here. In that case the Court said:

"This conclusion [of the Regional Director] was not unreasonable inasmuch as the ultimate question here is not whether any improprieties occurred during the campaign, but whether, in the circumstances, the particular conduct complained of 'created an environment of tension or coercion such as to preclude employees from exercising a free choice. For conduct to warrant setting aside an election, not only must that conduct be coercive, but it must be so related to the election as to have had a probable effect upon the employees' actions at the polls.' N. L. R. B. v. Zelrich Company, 344 F.2d 1011, 1015 (5th Cir. 1965). The Company has made no such showing here, and the Board's refusal to set aside the election because of alleged threats of physical violence was well within its discretion."

Here, as in the *Golden Age Beverage* case, the Company has not come forward with "specific evidence" that the "particular conduct complained of 'created an environment of tension or coercion * * so related to the election as to have had a probable effect upon the employees' actions at the polls.' " There was no evidence that the alleged misconduct was widespread, that any of the 276 employees who voted, other than the six persons affected, was even aware of the incidents, or that the incidents occurred in such proximity to the date of the election that they might have had any special significance to the other voters. In these circumstances the Acting Regional Director and the Board could reasonably

find that "even assuming *arguendo* that the conduct occurred as alleged, such activity * * * was insufficient to create a general atmosphere of confusion or fear of reprisal which rendered impossible a free election." See Intertype Co. v. N. L. R. B., 401 F.2d 41, 45–46 (4th Cir. 1968), cert. den., 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969); N. L. R. B. v. Zelrich Co., 344 F.2d 1011, 1014–1015 (5th Cir. 1965); Shoreline Enterprises of America, Inc. v. N. L. R. B., 262 F.2d 933, 942, 69 A.L.R.2d 1174 (5th Cir. 1959).

■ The Company's conclusory allegation, unsupported by evidence, that in certain instances the Company's employees who were alleged to have made threats or promises were "speaking for the Union" was not sufficient to demonstrate, even *prima facie*, that the Union was responsible for their utterances. See Intertype v. N. L. R. B., 401 F.2d 41, 45–46 (4th Cir. 1968), cert. den., 393 U.S. 1049, 89 S.Ct. 686 (1969); Manning, Maxwell & Moore, Inc. v. N. L. R. B., 324 F.2d 857, 858 (5th Cir. 1963); N. L. R. B. v. Dallas General Drivers, Warehousemen & Helpers, Local No. 745, 264 F.2d 642, 648 (5th Cir.), cert. den., 361 U.S. 814, 80 S.Ct. 54, 4 L.Ed.2d 61 (1959).

## THE DENIAL OF A HEARING

The Company argues that hearings were unlawfully denied, both during the representation proceeding and during the unfair labor practice proceeding, when its objections were dismissed pursuant to a motion granting partial summary judgment.

■ It is clear that there is no right to a post-election hearing in a representation proceeding. International Union of Electrical, Radio & Machine Workers, AFL–CIO v. N. L. R. B., 135 U.S. App.D.C. 355, 360, 418 F.2d 1191, 1196 (1969); N. L. R. B. v. Golden Age Beverage Co., 415 F.2d 26, 32 (5th Cir. 1969). Rather the Board's rules and regulations provide only that such hearings must be held when the objections raise "substantial and material factual issues" which cannot be resolved on the basis of administrative investigation without a hearing. 29 C.F.R. § 102.69 (c). This provision "is designed to resolve expeditiously questions preliminary to the establishment of the bargaining relationship and to preclude the opportunity for protracted delay of certification of the results of representation elections." N. L. R. B. v. Golden Age Beverage Co., 415 F.2d 26, 32 (5th Cir. 1969). See also International Union of Electrical, Radio & Machine Workers, AFL–CIO v. N. L. R. B., 135 U.S.App.D.C. 360, 361, 418 F.2d 1191, at 1196–1197 (1969); N. L. R. B. v. Tennessee Packers, Inc., 379 F.2d 172, 178 (6th Cir.), cert. den., 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967). That this qualified right of hearing satisfies all statutory and constitutional requirements is settled. N. L. R. B. v. Golden Age Beverage Co., 415 F.2d 26, 32 (5th Cir. 1969); N. L. R. B. v. Air Control Products, Inc., 335 F.2d 245, 249 (5th Cir. 1964).

■ In order to be entitled to a post-election hearing on its objections, "the objector must supply the Board with specific evidence which prima facie would warrant setting aside the election, for it is not up to the Board staff to seek out evidence that would warrant setting aside the election." United States Rubber Co. v. N. L. R. B., 373 F. 2d 602, 606 (5th Cir. 1967). Cf. N. L. R. B. v. Mattison Machine Works, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961). The burden on the Company to show that the election was not fairly conducted is not met by "nebulous and declaratory assertions, wholly unspecified," but only by "specific evidence of specific events from or about specific people." United States Rubber Co. v. N. L. R. B., 373 F.2d 602, 606 (5th Cir. 1967).

The acting Regional Director in his report assumed the truth of the Company's proffered testimony in support of its objections but he found, as a matter of law, that the objection was "without merit." In its exceptions to the report

the Company merely objected to findings "without a hearing." It now argues that its exceptions were sufficient to require the Board to hold an evidentiary hearing to reconsider the facts underlying the Acting Regional Director's conclusions. But as we said in a recent case where similar arguments were made:

"Mere reference to the principles set out above is sufficient to rebut this argument. The company did not 'clearly demonstrate that factual issues exist which can only be resolved by an evidentiary hearing.' The exceptions do not 'state the specific findings that are controverted' and 'show what evidence will be presented to support a contrary finding or conclusion.' Indeed, the exceptions 'do [no] more than question the interpretation and inferences placed upon the facts by the [Acting] Regional Director.' * * the Board is not itself required to rummage through a record in search of material which may controvert the Regional Director's findings. Such guidance was not provided here, and thus the Board was within its discretion in accepting the Regional Director's recommendations without holding a hearing."

International Union of Electrical, Radio & Machine Workers, AFL–CIO v. N. L. R. B., 135 U.S.App.D.C. 355 at 362, 418 F.2d 1191, at 1198 (1969). And the Circuit Court of Appeals for the Sixth Circuit has recently said in N. L. R. B. v. Tennessee Packers, Inc., 379 F.2d 172, 178, (6th Cir.), cert. den. 389 U.S. 958, 88 S.Ct. 338 (1967):

"Respondent's exceptions * * * do not state specific objections or indicate that material factual issues exist. They do not clearly put in issue the correctness of the Director's findings, but merely attack the correctness of his conclusions and inferences drawn from the facts uncovered in his investigation. It was proper for respondent to question the conclusions of the Director, but to require a hearing it was incumbent upon it to state what evidence it would produce to establish

that the conclusions were incorrect. Respondent fails to suggest any material facts which would be developed at a hearing."

In the case before us, as in the *Tennessee Packers* and the *Electrical, Radio & Machine Workers International* cases, the Board concluded that the Company's exceptions raised "no material or substantial issues of fact or law." Recognizing our limited role in the determination of such matters, we hold that "the Board has not acted arbitrarily or capriciously or abused its discretion by denying the Company an evidentiary hearing on its objections" in the representation proceeding. N. L. R. B. v. Golden Age Beverage Co., 415 F.2d 26, 33 (5th Cir. 1969).

Just as there was "nothing to hear" (N. L. R. B. v. Air Control Products, Inc., 335 F.2d 245, 249 (5th Cir. 1964)) on the Company's objections in the representation proceeding, so there was "nothing to hear" on this issue in the unfair labor practice case. No new and material evidence, previously unavailable, was offered. In this situation the Board, applying its rules, has consistently and correctly refused to permit the relitigation in an unfair labor practice proceeding of "any issue which was, or could have been, raised in the representation proceeding". 29 C.F.R. § 102.67(f). This policy has been sustained by the courts. N. L. R. B. v. Tennessee Packers, Inc., 379 F.2d 172 (6th Cir.), cert. den., 389 U.S. 958, 88 S.Ct. 338 (1967); Amalgamated Clothing Workers of America v. N. L. R. B., 124 U.S.App.D.C. 365, 369–372, 365 F.2d 898, 902–905 (1966). Although of course "an adversary hearing must be held at some point in the process where genuinely contested factual issues are properly raised" (International Union of Electrical, Radio & Machine Workers, AFL–CIO v. N. L. R. B., 135 U.S.App.D.C. 355, 360, 418 F.2d 1191, at 1196 (1969), a hearing is not required where no such issues exist. Neither the statute nor the constitutional imperative of due process

requires such an exercise in futility. It follows that the entry of summary judgment in the unfair labor practice case was proper. See N. L. R. B. v. Golden Age Beverage Co., 415 F.2d 26 (5th Cir. 1969); N. L. R. B. v. Air Control Products, Inc., 335 F.2d 245 (5th Cir. 1964). We do not consider that our conclusion on this point is inconsistent with N. L. R. B. v. Smith Industries, Inc., 403 F.2d 889 (5th Cir. 1968), on which the Company relies. In that case the court held that the employer had offered sufficient evidence to raise disputed issues of fact and make a hearing necessary.[2]

## THE REMEDY

The Union is satisfied with the Board's disposition of the case in every respect, except that it asks that the Board be ordered to grant the Union's request for retroactive compensatory relief for the Section 8(a) (1) violations. It further requests the so-called "*J. P. Stevens* remedy," which would require the publication of the Board's mandates through oral explanation of the Board's ruling on this case to assembled employees on Company time. J. P. Stevens (I) v. N. L. R. B., 380 F.2d 292 (2d Cir.), cert. den., 389 U.S. 1005; 88 S.Ct. 564, 19 L.Ed.2d 600 (1967); J. P. Stevens (III) v. N. L. R. B., 406 F.2d 1017 (4th Cir. 1968); J. P. Stevens (IV) v. N. L. R. B., 406 F.2d 1017 (4th Cir. 1968). It is said that in the circumstances of this case, the employees are entitled to a full explanation of their rights and the manner in which they are being protected, in such a way as to have as great an impact as the statements of the employer made in speeches to a captive audience.

In cases where similar requests have been made we have often noted that, "The Board's wide discretion is at its broadest in matters of remedial policy. *See* Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 215–216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)." Truck Drivers & Helpers Local No. 728 v. N. L. R. B., 135 U.S.App.D.C. 406, 415 F.2d 986, 990 (1969). Applying this principle, we have rejected pleas for compensatory financial relief and for the mailing of notices to employees. Truck Drivers & Helpers Local No. 728 v. N. L. R. B., 135 U.S.App.D.C. 406, 415 F.2d 986 (1969); United Steelworkers of America, AFL–CIO, Local 5571 v. N. L. R. B., 130 U.S.App.D.C. 369, 373, 401 F.2d 434, 438 (1968), cert. den., Stanley-Artex Windows, etc. v. N. L. R. B., 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465 (1969). See also International Brotherhood of Electrical Workers v. N. L. R. B., 135 U.S.App.D.C. 201, 417 F.2d 1144, at 1148 (1969). In this case as in those, "we cannot say the Board went beyond the bounds of its large latitude and discretion in the area of remedies." Amalgamated Clothing Workers v. N. L. R. B. (Block-Southland Sportswear, Inc.), 137 U.S.App.D.C. 93 at 100, 420 F.2d 1296, at 1303 (1969). Accordingly "[t]he Board's wide discretion to fashion appropriate remedies insulates its action in this case from judicial intervention", Amalgamated Clothing Workers v. N. L. R. B. (McEwen Mfg. Co.), 136 U.S.App.

---

2. At the unfair labor practice hearing the Company offered testimony by its plant manager that he became aware of certain Union campaign materials at some time after the 5-day period for filing objections to the election had expired. These materials, which the Company offered in evidence, were the same as those offered in support of the Company's amended objections to the election. The amended objections had been rejected by the Regional Director upon the ground that they were untimely filed. The Company did not appeal this ruling to the Board nor did it raise the issue in its exceptions to the report on objections. Accordingly the Board properly declined to reconsider the Regional Director's ruling or to receive the evidence in the unfair labor practice proceeding. See Board Rules and Regulations, 29 C.F.R. § 102.67(f) providing that the failure to request review "shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding".

D.C. 226, 419 F.2d 1207, at 1210 (1969); and we must refuse to modify the Board's order as requested by the Union.

For the foregoing reasons, the Company's petition to review and remand for a full hearing is denied, the Union's petition to review and modify is denied, and the Board's cross application for enforcement is granted.

So ordered.