NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MONROE TUBE COMPANY, INC., Respondent.

No. 89, Docket 76–4104.

United States Court of Appeals, Second Circuit.

Argued Sept. 27, 1976.

Decided Nov. 29, 1976.

Mary K. Schuette, Atty., John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Robert Sewell, Atty., N.L. R.B., Washington, D.C., for petitioner.

Frederick L. Sullivan, Richard D. Hayes, Sullivan & Hayes, Springfield, Mass., for respondent.

Before WATERMAN and VAN GRAAF-EILAND, Circuit Judges, and MOTLEY, District Judge.*

MOTLEY, District Judge:

This is a petition by the National Labor Relations Board ("the Board") pursuant to Section 10(e) of the National Labor Relations Act, as amended,[1] ("the Act") for enforcement of an order (1) directing Respondent, Monroe Tube Company, Inc. ("the Company"), to cease and desist from engaging in certain specified activities allegedly

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. 29 U.S.C. §§ 151, et seq.

violative of Section 8(a)(1)[2] of the Act; (2) requiring the posting of appropriate notices; and (3) setting aside a representation election, with a remand to the Regional Director to conduct a new election.

After a hearing before an Administrative Law Judge at which both the unfair labor practice charges and election objections were consolidated for trial,[3] the Board concluded that Respondent had violated Section 8(a)(1) of the Act "[b]y encouraging and assisting employees to withdraw their union authorization cards and by interrogating employees concerning their union activities and union sentiments".[4] The Board rejected, however, those objections to the election based upon allegations that Respondent's president had publicly threatened to close the Company if the Union[5] won the election. In this enforcement proceeding, we are called upon to determine whether the Board's findings that Respondent violated Section 8(a)(1) are supported by substantial evidence on the record considered as a whole.[6]

Respondent employs about fifty persons in the manufacture of metal tubing at its one plant in Monroe, New York. Early in August of 1973, the Union began a drive to organize the factory. By the end of the first week, a number of employees had signed union authorization cards. On August 10, Respondent's president, Harold Grout, assembled all employees in the plant lunchroom for a brief prepared speech in which he advised the employees that signing cards would have serious legal consequences. He urged them not to sign until they had heard Respondent's views on union representation. He promised another meeting within a few days at which these views would be presented.

Some three or four days after Mr. Grout's speech, "night foreman"[7] James Verbert approached Perry Nowak, an employee on his shift, and asked him to sign a written form seeking the withdrawal of his union authorization card. Verbert "made it clear" that he wanted Nowak to sign the card, although Nowak indicated that he wished to draft his own copy. Nowak ultimately did sign but asked Verbert not to turn the card in to the office. He wanted to draft his own letter and turn it in himself. Within the next few days, plant manager John Romer returned the form to Nowak advising that Nowak had neglected to fill in Respondent's name, and that the form would not be effective unless he did so. Nowak reiterated that he wanted to draft his own letter. Despite Romer's repeated requests that he complete the form, Nowak refused to do so, whereupon Romer became "flustered" and left. Nowak never sent his own letter requesting the return of his card.

On August 15, the employees were again assembled in the lunchroom. Mr. Grout,

2. 29 U.S.C. § 158(a)(1).

3. The case has had a somewhat unusual procedural history before the Board. The decision of the Administrative Law Judge who initially heard the case was issued on May 16, 1974. On December 10, 1974, as a result of its determination that the Administrative Law Judge's decision reflected bias against Respondent, the Board issued an Order directing a hearing *de novo* before a different Administrative Law Judge. Thereafter, the parties filed various motions with the Board; the General Counsel (with support from the charging party, the Union) joined Respondent in requesting a stay of the order for a hearing *de novo*. The Board, noting that there was apparent agreement among all parties that a hearing *de novo* should not be held, vacated its December 10 order and proceeded to make its own review of the record in the case. On September 15, 1975, the Board issued a Proposed Decision, Order, and Direction of Election which made proposed findings of fact and conclusions of law on the basis of its review. On December 1, 1975, after considering Respondent's exceptions and brief, the Board adopted its own Proposed Decision, Order, and Direction of Election.

4. The Board's decisions are reported at 220 NLRB No. 48 and 221 NLRB No. 151.

5. Local 445, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America.

6. 29 U.S.C. § 160(e).

7. As indicated, *infra*, the exact nature of Verbert's position and authority was contested by Respondent before the Board.

again speaking from a prepared text repeated his earlier warning about the consequences of joining a union and reminded the employees that Respondent, rather than the Union, provided wages and fringe benefits. He indicated that if the Union had refused to return authorization cards to employees who wanted them back, that fact should make them realize the sort of organization with which they were dealing. He cautioned the employees that they had the right to be free of any "pressure or harassment" to sign cards against their will. He added that any employees who had been refused the return of their cards should write directly to the Union headquarters in Yonkers for such return. He suggested that the employees keep a copy of any such letter. He offered the use of Respondent's copying equipment for that purpose.

On August 16, the Union filed a petition to represent Respondent's employees with the Board. About the same time, Mr. Romer told a group of employees that he would supply them with the Union's address in the event that they decided to send a letter requesting the return of their authorization cards. When employee James Sinsabaugh, who had voluntarily written a withdrawal letter, later asked Mr. Romer for the address, Romer handed him a number of slips of paper bearing the address and told him to give them to other employees who wanted to get their cards back.

At approximately the same time, foreman Verbert asked Charles Rosenstock, another worker on the night shift, whether he had signed a union card and whether he was serious when he did so. Rosenstock replied that he had, in fact, signed a card, but that he wasn't really sure whether he was serious in so doing. Verbert made no inquiry as to whether other employees had signed cards, but he asked whether Rosenstock wanted to write for the return of his card. He offered to provide Rosenstock with the Union's address. About a week later, Rosenstock wrote such a letter, gave it to Verbert, and received a copy of it from Respondent after it was mailed to the Union.

At the company picnic on August 18, Verbert asked Edward Willard, another employee on his shift, whether he had written to the Union to have his authorization card returned. When Willard responded that he had not, Verbert wrote a letter of withdrawal and asked him to sign it. In view of Verbert's previous inquiries some days earlier as to whether he had signed a card and whether anyone else had signed cards, Willard signed the letter and gave it back to Verbert. The letter was apparently never sent to the Union, however, perhaps in view of the fact that all the employees had been drinking to some extent at the outing.[8]

The Union withdrew its representation petition on September 5 and filed a new petition the following day. Subsequently, an election was scheduled for October 12. On the evening of October 10, President Grout assembled the "night shift"[9] employees for a final speech concerning the Union. On the following day, he gave a similar speech to the day shift. In both of those extemporaneous speeches, Mr. Grout reiterated the themes of the speeches he had given in August, emphasizing the disadvantages which he perceived in belonging to a union. In addition, he told the employees that Respondent was not in a good financial condition, that it had difficulty in competing with other companies because of its location and older production equipment, and that he had considered selling the business.

The election resulted in the employees' rejection of the Union by a vote of 22 to 15, with seven ballots challenged by the Union, but undeterminative. The Union filed timely objections to the election based on alleged threats made by President Grout and production engineer Frank Hegedus to the effect that Respondent would be closed in the event of a Union victory in the

---

8. Willard even testified that he was uncertain as to whether or not he might have signed more than one such letter that day.

9. One shift of eight employees worked from approximately 4:30 P.M. to 1:00 A.M.

election. (The Board ultimately found after the hearing, however, that there was insufficient evidence in the record to support those allegations. The objections were dismissed.)

On October 23, after the time for filing objections to the election had expired,[10] the Union filed an unfair labor practice charge. The charge alleged the same speech threats on which the election objections had been based and, in addition, alleged that Respondent had unlawfully solicited the withdrawal of employees' union authorization cards. Complaint issued on these allegations on December 19. The objections and unfair labor practice allegations were consolidated for purposes of a hearing. At the hearing in January of 1974, the complaint was amended to include additional allegations that Respondent had engaged in unlawful interrogation of its employees concerning their union activities.

On the basis of the documentary and testimonial evidence adduced at the hearing in January of 1974,[11] the Board found Respondent in violation of Section 8(a)(1) of the Act. It ordered Respondent to cease and desist from "[e]ncouraging and assisting employees to withdraw their union authorization cards and interrogating employees concerning their union sentiments or union activities". It further ordered that Respondent cease and desist from "[i]n any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the Act". Respondent appeals from the Board's unfair labor practice findings, order and remedy, including the direction of another election.

### The Status of James Verbert

■ Since much of the allegedly unlawful conduct on which the Board predicates its unfair labor practice findings was the activity of Verbert, we first examine the Board's finding that Verbert was a "supervisor" within the meaning of the Act, so as to make his conduct attributable to Respondent. While we agree that this is a close question, we find that the Board's affirmative finding was without sufficient support in the record.

Section 2(11) of the Act [12] defines a supervisor as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." It is well settled that this section is to be read in the disjunctive, and that "the possession of any one of the listed powers is sufficient to cause the possessor to be classified as a supervisor." *N.L.R.B. v. Metropolitan Life Insurance Co.,* 405 F.2d 1169, 1173 (2d Cir. 1968).

In its decision, the Board had to rely on a number of factors to support its conclusion that Verbert was, in fact, a supervisor, rather than a non-supervisory leadman as Respondent argues. There was evidence that Verbert, as "night foreman", was "responsible for eight people" on the night shift and that there was frequently no one of higher authority in the plant during that shift. Verbert was empowered to move employees from job to job when necessary, spent about 50 percent of his time doing the same physical work as the other members of the shift, was salaried and earned 30 percent more than the other employees on his shift and was regarded by the night shift employees as their supervisor. Finally, the record also reflected that Verbert allocated work to the members of the night shift but only in accordance with the directions of Charles Mancuso, the mill foreman during the day shift.

---

10. Objections to elections must be filed within five days after the election. NLRB Rules and Regulations, Series 8. Title 29 CFR § 102.-69(a).

11. See note 3, *supra.*

12. 29 U.S.C. § 152(11).

As Respondent suggests, other evidence in the record is consistent with a finding that Verbert's position could more accurately be characterized as that of a leadman. He did not attend weekly management meetings. He did not have an office or desk of his own. His instructions for the night shift as to work priorities and scheduling were received from Mr. Mancuso. Any action concerning emergency personnel situations had to be reported to Mr. Mancuso. And, lastly, no one was designated as responsible in the sense of having direct supervisory authority during the evening hours.

We feel that the Board could reasonably have found, on the above evidence, that Verbert had authority to transfer members of the shift from job to job, and responsibly to direct them, particularly in view of the fact that, for at least a substantial portion of each of the night shifts, there was no one of greater supervisory authority in the plant. However, we conclude that Verbert was not a supervisor within the meaning of the Act because his exercise of authority was of a strictly routine nature pursuant to Mancuso's directions. *National Labor Relations Board v. Cousins Associates, Inc.,* 283 F.2d 242 (2d Cir. 1960); *Precision Fabricators v. N.L.R.B.,* 204 F.2d 567, 569 (2d Cir. 1953).

In so holding, we are cognizant of the fact that "the Board's findings in this area are entitled to special weight since it possesses expertise in 'evaluating actual power distributions which exist within an enterprise' needed for drawing lines between managerial personnel and the rank and file." *Amalgamated Local 355 v. N.L.R.B.,* 481 F.2d 996, 1000 (2d Cir. 1973), quoting *N.L.R.B. v. Metropolitan Life Insurance Co., supra,* at 1172. Thus, when the Board exercises its "special function of applying the general provisions of the Act to the complexities of industrial life," *N.L.R.B. v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963), and determines that an individual possesses supervisory status, "the Board's determina-

tion stands if it has warrant in the record and a reasonable basis in the statute." *N.L.R.B. v. Big Ben Department Stores,* 396 F.2d 78, 82 (2d Cir. 1968). However, the Act expressly requires that the authority exercised by the employee in question be of a non-routine nature.

### The Solicitation Charges

■ We are also unable to find substantial evidence on the record as a whole for the Board's finding that Respondent violated Section 8(a)(1) of the Act by the facts enumerated above in which employees were encouraged and assisted in withdrawing their authorization cards.

We note preliminarily—but critically— that Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of rights guaranteed in Section 7 of the Act,[13] among which is the right to form, join, or assist labor organizations. Thus the essence of the proscribed conduct is not merely opposition to union activity, but interference or coercion which makes impossible the free exercise of employees' rights.

■ We have been cited no case, nor do we know of any, which holds that it is *per se* a violation of Section 8(a)(1) for an employer to suggest that it is possible for his employees to withdraw their union authorization cards, or for an employer to make available the address of the Union's headquarters for that purpose, or for the employer to engage in the limited effort observed here to assist employees in the preparation of withdrawal letters. While it is certainly true that an employer's solicitation of withdrawal letters *may* violate the Act under some circumstances, the propriety of such conduct must be assessed in the light of all the facts in the case, particularly the employer's prior and contemporaneous conduct in dealing with union activities.

None of the cases cited by the General Counsel in his brief appear to establish a

13. 29 U.S.C. § 157.

contrary proposition, and all appear to be distinguishable on their facts.

In *N.L.R.B. v. Elson Bottling Company*, 379 F.2d 223 (6th Cir. 1967), the Board found that the company engaged in a campaign of coercive speeches to its employees, threatening layoffs and curtailment of operations, as well as promising wage increases. The employer prepared two forms—a withdrawal form for those employees who had signed union cards and a disclaimer of interest in union representation for those who had not. The employees were called into the company's office one by one, where one of the managerial officials gave them an "opportunity" to sign one of the two statements. In that manner, signatures were obtained from all 23 of the company's employees, and the company then put its promised wage and commission increases into effect and rejected the union's bargaining request.

Similarly, the company's solicitation activity in *N.L.R.B. v. Deutsch Company, Metal Components Division*, 445 F.2d 902 (9th Cir. 1971), *cert. den.* 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 454 (1972), *reh. den.* 405 U.S. 1076, 92 S.Ct. 1492, 31 L.Ed.2d 210 (1972), was accompanied both by unlawful interrogation and also by invocation of an invalid prohibition against union solicitation. Moreover, the Company sent two mailings to its employees urging them to revoke their union authorization cards, and enclosing post cards addressed to the Board with a prepared statement of revocation.

While in *N.L.R.B. v. S & H Grossinger's Inc.*, 372 F.2d 26 (2d Cir. 1967) this court deemed unlawful an employer's suggestion to its employees that they withdraw from the union, when the company also "assisted" the employees in the preparation of a petition to that effect and allowed it to be circulated on company time and property, that activity was part of a larger pattern of hostility to union activity. The Board also found, and this court agreed, that Grossinger's had promised its employees a variety of benefits during the period prior to an election for the selection of a bargaining representative; that the company sought to convince employees that union meetings were held under employer surveillance; and that the employer had engaged in unlawful interrogation of its employees.

In *Amalgamated Clothing Workers of America v. N.L.R.B.*, 137 U.S.App.D.C. 330, 424 F.2d 818 (1970), the court held unlawful a speech by the company's president in which he made the "very strong suggestion" that his employees who had signed cards should sign and mail to the union form letters which he provided withdrawing their union authorization cards. However, that activity was in the context of very strongly expressed hostility to union activity, and threats that the employer would retaliate by discontinuing its practice of soliciting marginal contracts to avoid loss of work and by closing the plant.

In *Edward Fields, Inc. v. N.L.R.B.*, 325 F.2d 754 (2d Cir. 1963), a vice-president of the company suggested that the employees prepare a petition calling for the return of previously signed union authorization cards and, later, prepared such a petition at the request of one of his employees. The petition was then circulated among all the employees working that day by one of the employees, who indicated that everyone had to sign the petition regardless of whether he previously had signed a union card. Through this effort, the signatures of 24 of the company's 27 employees were obtained. This court held that "the assistance given by [the vice-president] in counseling and preparing the necessary papers for union disaffiliation, together with his authorization of its circulation among the employees might properly be found part of an anti-union campaign and in violation of § 8(a)(1)." 325 F.2d at 760. Significantly, however, that conduct was in the context of unlawful interrogation, attempted surveillance of employee organizational activities, and threats of loss ·of existing benefits in the event of union recognition.

Finally, in *N.L.R.B. v. Priced-Less Discount Foods, Inc.*, 405 F.2d 67 (6th Cir. 1968), the Board found, and the court agreed, that an employer's conduct in soliciting withdrawals of union authorization

cards was violative of the Act. In that case, employees were apparently summoned to the manager's office and requested to execute letters withdrawing their designations of the union as their bargaining representative. Over half of the company's employees thus signed letters withdrawing their cards. Additionally, the employer furnished the paper, envelopes, and postage for mailing; prepared a text for the letters; kept copies of the letters, and actually mailed the letters.

■ In examining these cases, we do not mean to suggest, of course, that an employer's conduct in soliciting and facilitating the withdrawal of union authorization cards, without more, may never violate the Act. Indeed, the *Priced-Less* case found just such a violation. We do suggest, however, that the propriety or impropriety of such conduct must be judged in the light of all the circumstances of the case to ascertain whether it was, in fact, coercive or otherwise in violation of the law. Where the alleged solicitation constitutes the principal illegal activity, unaccompanied by other illegal conduct,[14] it must be of such a nature as to indicate a realistic possibility that employee coercion thereby is likely to result.

We do not find such circumstances in this case. While President Grout did indicate in his speech of August 15 that he felt the employees should reconsider their decision to sign union authorization cards, he merely indicated that he would provide his employees with the Union's address if they wanted it, and offered the use of Respondent's copying equipment for employees to make copies of their own correspondence. Employees were never put on the spot by being called into the office and asked to sign prepared letters of withdrawal.

On the contrary, three of the encounters on which the Board relied in finding employer coercion involved Verbert, a non-supervisory employee, rather than a high company official, in circumstances which were probably highly unlikely to cause the employees to become cowed. Willard signed

his letter at a company picnic, when he was not even sure whether he had signed one letter or more on that day, and his letter was never received by the Union. Mr. Rosenstock was questioned only once, and, without any subsequent inquiry or intimidation by his foreman, drafted his own letter of withdrawal approximately a week later. Nowak was asked to sign the form and, ultimately, did so, but without providing Respondent's name on the form to make it effective. We find these circumstances clearly distinguishable from those situations in which an employee was pressured into signing a withdrawal letter by the cumulative effect of unfamiliar surroundings and the presence of *high* company officials.

Moreover, we consider the episodes involving the plant manager, John Romer, to be *de minimis*. We know of no reason why he should be prohibited from supplying the employees, at their request, with the address of the Union headquarters, even if for the purpose of writing to withdraw their authorization cards. And, while he certainly did approach Mr. Nowak on one occasion requesting that he complete the letter which he had signed, Mr. Nowak was sufficiently uncoerced by the encounter that he refused to do so, and never submitted a letter of his own.

We are mindful, of course, that employer conduct may be found violative of Section 8(a)(1) even though, through employee temerity, it does not succeed in deterring the employees in the exercise of their Section 7 rights. However, in the circumstances of this case—where only three of almost fifty employees were asked to sign or prepare withdrawal letters, where only one of the resulting letters (prepared by the individual himself) actually arrived at the Union headquarters, where the assistance offered the employees was as minimal as it was here, and where the record is devoid of any other sustainable allegations of either election impropriety or unfair labor practices—we find that the record is lacking in substantial evidence from which the Board could have

---

14. See our discussion of the interrogation charges, *infra*.

found a violation of Section 8(a)(1). On the facts of this case, the employer conduct complained of is *de minimis*.

### The Interrogation Allegations

■ The Board also held that Respondent violated Section 8(a)(1) by coercively interrogating two employees concerning their union activities and union sentiments. We find that the interrogation charges are not supportable under the standards applied in this Circuit.

■ "The rule in this Circuit is that employer interrogation is unlawful if it is coercive in light of all of the surrounding circumstances." *Retired Persons Pharmacy v. N.L.R.B.*, 519 F.2d 486, 492 (2d Cir. 1975). "[I]nterrogation, not itself threatening, is not held to be an unfair labor practice unless it meets certain fairly severe standards." *Bourne v. N.L.R.B.*, 332 F.2d 47, 48 (2d Cir. 1964). While the absence of any one of the "indicia of coercive interrogation" set forth in *Bourne* does not necessarily exonerate the employer, *Retired Persons Pharmacy, supra*, we feel that the facts of this case fall so far short of meeting the tests set forth in *Bourne*, to which we continue to adhere, that the Board's findings cannot be upheld.

*Bourne* suggested that evidence of employer interrogation be judged by five criteria: (1) the background of the employer/union situation; (2) the nature of the information sought; (3) the identity of the questioner; (4) the place and method of interrogation; and (5) the truthfulness of the responses.

The entire evidence in the record on this issue is set forth in the margin.[15] Whatever may be the rule elsewhere,[16] it is clear that this interrogation is not improperly coercive under *Bourne*, even if we were to assume, *arguendo*, that Verbert, the questioner, was a supervisor. Although the inquiries were made against the background of an intensive, but legal, anti-union campaign by Respondent, there was no evidence of any prior activity tending to foreclose employees' opportunity to organize. There is little in the course of the inquiry which would indicate that Respondent was seeking to develop information on which to base action against other employees. The questioning was carried out by Verbert, a non-supervisory employee, in an atmosphere which was not shown to be unduly formal or unfamiliar. And, finally, the responses were evidently truthful.

Under these circumstances, we have no difficulty in holding that the Board's find-

---

**15.** With respect to Verbert's questioning of employee Willard, the following testimony was developed by the General Counsel at the administrative hearing:

Q. Do you recall the first time he asked you?

A. No, I don't remember when it was. I know, it was before the clambake though.

Q. Well, the first time he asked you to get it back, did he tell you how he knew you had signed the card?

A. I think I told him I signed it when he asked me.

Q. He asked you if you signed one too?

A. Yes, I told him anyhow I signed one— one of the cards.

Q. Did he ask you if anyone else signed?

A. Yes. Yes, sir.

Q. Who did you tell him?

A. I am not the only one. I know others signed. I knew other people signed.

General Counsel developed the following testimony regarding Verbert's interrogation of employee Rosenstock:

Q. Mr. Rosenstock, after you signed that particular card, did Mr. Verbert ever ask you whether or not you had signed for the Union?

A. You are talking about the union card now?

Q. Yes.

A. He asked me if I had signed a card.

Q. When did he ask you that?

A. It might have been a week or two after I signed the card.

Q. Was this before you sent in the letter to the Union?

A. Somewhere around that area.

Q. Was it before or not?

A. I think he asked me if I signed the card before.

Q. You sent in the letter?

A. Before I sent in my letter, yes.

Q. Did he say anything else?

A. Well, he asked me if I was serious when I signed the card and at that time I told him I really don't know.

Q. What else did he say?

A. That was it.

**16.** See *Johnnie's Poultry Co.*, 146 NLRB 770.

ing of unlawful interrogation is without substantial support in the record, as that requirement has been interpreted in this Circuit. Even making due allowance for the fact that inquiries which do not appear threatening to federal judges may appear so when directed to vulnerable employees in very different circumstances,[17] we find it highly unlikely that the interrogations here in evidence should fall within the prohibition of the Act.

Accordingly, we deny enforcement of so much of the Board's order as directed Respondent to cease and desist from the specified practices, and to post notices.

As noted earlier, the Board determined, not only that the conduct here complained of constituted an unfair labor practice mandating the cease and desist order and notices, but it also decided that Respondent's activity precluded a fair election on October 12, 1973. Relying on its prior decision in *Dawson Metal Products, Inc.*, 183 N.L.R.B. 191 (1970), the Board held that matters litigated in the consolidated complaint case could serve as the basis for an order setting aside the election in the representation case, even though those matters were not raised by the objections.[18] Accordingly, the Board set aside the election, remanding the representation proceeding to the Regional Director to conduct a new election.

■ Respondent now urges that we should set aside this direction of election on a number of grounds, particularly since the conduct on which the cease and desist order was predicated is exactly the same conduct which was judged to preclude a fair election. While Respondent's position is appealing in its invocation of judicial economy and expeditious handling of disputed legal issues, it appears to be against the weight of authority among courts which have considered this question. The judicial consensus appears to be that, in this procedural situation, the election order in the representation case is not a final order[19] subject to our review, despite the fact that it was entered in a consolidated proceeding and predicated upon the same actions giving rise to the unfair labor practice allegations. *See A.F.L. v. N.L.R.B.*, 308 U.S. 401, 409, 411, 60 S.Ct. 300, 84 L.Ed. 347 (1940); *Bonwit Teller, Inc. v. N.L.R.B.*, 197 F.2d 640, 642 n. 1 (2d Cir. 1952), *cert. den.*, 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953); *N.L.R.B. v. Lifetime Door Co.*, 390 F.2d 272, 274, n. 3 (4th Cir. 1968); *Daniel Construction Co. v. N.L.R.B.*, 341 F.2d 805, 808–810 (4th Cir. 1965), *cert. den.*, 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965); *Hendrix Manufacturing Co. v. N.L.R.B.*, 321 F.2d 100, 106 (5th Cir. 1963).

The one case which we have been cited in which a Court of Appeals also decided the issues involving the representation case and direction of election, *N.L.R.B. v. Reliance Steel Products Company*, 322 F.2d 49 (5th Cir. 1963), contains no discussion of the jurisdictional question, and apparently represents a minority view. Moreover, in view of the clear line of decisions governing this specific question under the Act, we consider it inappropriate to assume jurisdiction of the representation case on some other rationale, such as the exercise of our ancillary jurisdiction. We feel constrained to follow the view advanced by the Board and decline to review the election order at this time.

---

17. *See* Hays, J., dissenting, in *N.L.R.B. v. The Golub Corporation*, 388 F.2d 921, 929 (2d Cir. 1967).

18. Member Penello dissented on this point and on the direction of election.

19. *See* 29 U.S.C. §§ 160(e) and (f).